UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
FIELD DAY, LLC f/k/a NEW YORK MUSIC
FESTIVAL, LLC, and AEG LIVE LLC f/k/a
AEG CONCERTS LLC,

                                        Plaintiffs,

                                                                    **MEMORANDUM & ORDER**
                    - against -                                     04-CV-2202 (DRH) (WDW)

COUNTY OF SUFFOLK, SUFFOLK COUNTY
DEPARTMENT OF HEALTH SERVICES,
SUFFOLK COUNTY EXECUTIVE ROBERT
GAFFNEY, COMMISSIONER OF THE
SUFFOLK COUNTY DEPARTMENT OF
HEALTH SERVICES BRIAN L. HARPER,
COMMISSIONER OF THE SUFFOLK
COUNTY POLICE DEPARTMENT, JOHN C.
GALLAGHER, DIRECTOR OF THE SUFFOLK
COUNTY DEPARTMENT OF HEALTH
SERVICES ROBERT MAIMONI, CHIEF OF
THE BUREAU OF PUBLIC HEALTH
PROTECTION BRUCE WILLIAMSON,
PRINCIPAL PUBLIC HEALTH SANITARIAN
ROBERT GERDTS, DEPUTY SUFFOLK
COUNTY ATTORNEY ROBERT CABBLE,
DEPUTY SUFFOLK COUNTY EXECUTIVE
JOE MICHAELS, SERGEANT PATRICK
MAHER OF THE SUFFOLK COUNTY POLICE
DEPARTMENT, THE TOWN OF RIVERHEAD,
RIVERHEAD CHIEF OF POLICE DAVID
HEGERMILLER, and NEW YORK STATE
HEALTH COMMISSIONER ANTONIA C.
NOVELLO,

                                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

**O'MELVENEY & MEYERS LLP**

Attorneys for Plaintiffs
Times Square Tower
7 Times Square, 34th Floor
New York, New York 10036
By: Charles E. Bachman, Esq.

**ELIOT SPITZER, NEW YORK STATE ATTORNEY GENERAL**
Attorney for Defendant New York State Health Commissioner Antonia C. Novello
120 Broadway, 24th Floor
New York, New York 10271
By: Seth J. Farber, Esq.

**CHRISTINE MALAFI, SUFFOLK COUNTY ATTORNEY**
Attorney for the Suffolk County Defendants
100 Veterans Memorial Highway, P.O. Box 6100
Hauppauge, New York 11788
By: Christopher A. Jeffreys, Esq.

**SMITH, FINKELSTEIN, LUNDBERG, ISLER, AND YAKABOSKI, LLP**
Attorneys for Defendants Town of Riverhead and Chief of Police David Hegermiller
456 Griffing Avenue, P.O. Box 389
Riverhead, New York 11901


**HURLEY, District Judge:**

*INTRODUCTION*

The above-captioned Plaintiffs are concert promoters who claim to have been harmed when the Defendants "unlawfully and unconstitutionally" refused to issue them a permit pursuant to New York's "Mass Gathering Law." The Plaintiffs seek monetary relief and punitive damages pursuant to a variety of federal and state causes of action; they also seek a judgment declaring the law facially unconstitutional, and an injunction that would prevent the Defendants from enforcing it in the future. All of the Defendants have moved to dismiss the complaint — or at least the causes of action that pertain to them. The Plaintiffs have moved for a preliminary

injunction that would prevent the Defendants and any of their respective political subdivisions or representatives from applying the Mass Gathering Law.                    The Plaintiffs' motion for preliminary injunctive relief, and the motion to dismiss by the New York State Health Commissioner have been addressed in a separate order.[1]   The present Order addresses the motions to dismiss filed by two groups of Defendants:  the Town of Riverhead and its Chief of Police (collectively "Riverhead"); and all of the other Defendants (collectively "Suffolk" or "the County").  For the reasons that follow, these Defendants' motions are denied.

## BACKGROUND

I.      *New York's "Mass Gathering Law"*

New York's Public Health Law § 225(4) empowers New York's "public health council" to   establish, subject to approval by the Health Commissioner, "sanitary regulations, to be known as the sanitary code of the state of New York."   Section 225(5)(o) of the law states, in part, that the sanitary code may:

> require that application be made for a permit to . . . hold or promote by
> advertising or otherwise a mass gathering which is likely to attract five
> thousand people or more and continue for twenty-four hours or more and
> authorize appropriate officers or agencies to issue such a permit when the
> applicant is in compliance with the established regulations and when it
> appears that . . . such gathering [can be] held without hazard to health and
> safety; establish regulations with respect to such gatherings to provide for:
> the furnishing of adequate undertakings to secure full compliance with the
> sanitary code and other applicable law, adequate and satisfactory water

---

[1]      That Order found that certain portions of the Mass Gathering Law are constitutionally infirm, but severable from the remainder of the law, and accordingly denied the Commissioner's motion to dismiss and granted the Plaintiffs' motion in part, by preliminarily enjoining the Defendants from enforcing the invalid portions of the Mass Gathering Law against the Plaintiffs.

supply and sewerage facilities, adequate drainage, adequate toilet and lavatory facilities, adequate refuse storage and disposal facilities, adequate sleeping areas and facilities, wholesome food and sanitary food service, adequate medical facilities, insect and noxious weed control, adequate fire protection, and such other matters as may be appropriate for security of life or health. In his review of applications for permits for the holding or promoting of such a gathering the permit-issuing official may require such plans, specifications and reports as he shall deem necessary for a proper review, and in his review of such applications, as well as in carrying out his other duties and functions in connection with such a gathering, the permit-issuing official may request and shall receive from all public officers, departments and agencies of the state and its political subdivisions such cooperation and assistance as may be necessary and proper.

(Emphases added). Section 7-1 of New York's State Sanitary Code states in relevant part:

(a) No person shall hold or promote, by advertising or otherwise, a mass gathering unless a permit has been issued for the gathering by the permit-issuing official.

(b) Application for a permit to promote or hold a mass gathering shall be made to the permit-issuing official, on a form and in a manner prescribed by the State Commissioner of Health, by the person who will promote or hold the mass gathering. Application for a permit to promote or hold a mass gathering shall be made at least 15 days before the first day of advertising and at least 45 days before the first day of the gathering. Water and sewage facilities shall be constructed and operational not later than 48 hours before the first day of the mass gathering. The application shall be accompanied by such plans, reports and specifications as the permit-issuing official shall deem necessary. The plans, reports and specifications shall provide for adequate and satisfactory water supply and sewerage facilities, adequate drainage, adequate toilet and lavatory facilities, adequate refuse storage and disposal facilities, adequate sleeping areas and facilities, wholesome food and sanitary food service, adequate medical facilities, insect and noxious weed control, adequate fire protection, and such other matters as may be appropriate for security of life or health.

10 NYCRR 7-1.40 (emphases added). The Sanitary Code also requires all mass gathering permit

applications to be accompanied by an "engineering report" containing, in part,

> [D]etailed plans for transportation arrangements from noncontiguous parking facilities to the site to fully serve all reasonably anticipated requirements at a rate of no less than 20,000 persons per hour; including a statement from the county sheriff, State police, New York State Department of Transportation or other law enforcement agency certifying that the traffic control plan is satisfactory.

10 NYCRR 7-1.41(d)(2) (emphasis added).   The law contains no provision requiring a "permit-issuing official" to process a mass gathering permit application within a specific amount of time.

II.     *Events Precipitating the Present Lawsuit*[2]

According to the Second Amended Complaint ("the Complaint"), Plaintiff Field Day is a limited liability company formed in order to promote a two-day music and art festival ("the Festival"), which was to take place on June 7-8, 2003.   Plaintiff AEG is a limited liability company in the business of organizing music concerts, and agreed to provide Field Day with management, marketing, and funding for the Festival.

Field Day began "efforts to promote and produce" the Festival in June 2002.   After considering several other locations, on November 15, 2002 its representatives visited  Calverton Enterprise Park ("the Park"), located within the Town of Riverhead, in Suffolk County, New York,[3] and soon after notified the Riverhead Town Supervisor that they wanted to lease it for the Festival.   On February 20, 2003, Field Day entered into a "License Agreement for Outdoor Event" with the Riverhead Community Development Agency (CDA), which the Parties do not

---

[2]     The following facts are derived entirely from the Plaintiff's Second Amended Complaint, and are presumed to be true for purposes of the present motions.   *See Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S. 816 (1994).

[3]     *See* http://www.riverheadli.com/calvert.html.

dispute is a public instrumentality of the Town of Riverhead.[4]

Under the terms of the License Agreement, Field Day paid $150,000 to lease roughly 1,000 acres of the Park from May 5, 2003 until June 22, 2003 for the purpose of holding the Festival; Field Day was to be "responsible for carrying out and shall have exclusive control of all operations associated with the Event and related activities, including . . . security for the event (other than the officials of the Town Police Department which shall be arranged and provided by the CDA)"; the agreement also states that the CDA "agrees that it shall provide sufficient police protection (including necessary barriers and bike racks); and any necessary road signs for purposes of directing highway and road traffic only." The agreement also states in part that Field Day "will secure a 'Mass Gathering Permit,' " that such permit is a "Necessary Approval," and that "if Field Day is unsuccessful in obtaining the Necessary Approvals, . . . then this Agreement shall terminate, and the obligations of each party herein shall be null and void."

On February 27, 2003, Field Day held a preliminary meeting with officials from Riverhead and the Suffolk County Department of Health Services (SCDHS), including Suffolk's Bureau of Public Health Protection Chief Bruce Williamson, Suffolk's "Principal Public Health Sanitarian" Robert Gerdts, SCDHS Deputy Chief of Operations Martin Matuza, Riverhead Chief of Police David Hegermiller, and Riverhead Fire Marshall Bruce Johnson. At this meeting, Field Day gave copies of its Mass Gathering Permit Application to Johnson and Matuza, and distributed copies of its "Preliminary Draft Event Operation Plan," outlining its plans to ensure water, sewerage, toilet, refuse, food, and medical facilities, fire protection services, traffic and

---

[4]    *See id.*

transportation arrangements, and other "matters relating to security and public safety."

On March 12, 2003, Field Day and SCDHS held a "project coordination meeting" to "discuss the scope of the Festival and the process by which Field Day would satisfy aspects of the New York Mass Gathering Laws." The meeting was attended by "representatives from most of the Riverhead and Suffolk County agencies involved with the planning of the Festival," including Suffolk County's EMS, Fire and Rescue Department, and Food Handling Unit, and Riverhead's Fire and Police Departments. At the meeting, Gerdts was authorized by SCDHS to act as "lead agent with respect to the planning of the Festival," and he requested additional copies of Field Day's Mass Gathering Permit Application, and its "Preliminary Draft Event Operation Plan." "At no time," says Field Day, "did Defendant Gerdts or any other public official suggest that receipt of Field Day's Permit Application approximately 75 days prior to the proposed date of the Festival was not sufficient time for the SCDHS to process the Permit Application and fulfill any requirements necessary to ensure the timely issuance of the Mass Gathering Permit."

On March 21, 2003, SCDHS held a "four-hour permit planning meeting" between representatives of Field Day, Suffolk County, and Riverhead. Field Day provided Gerdts with the requested copies of its Mass Gathering Permit Application and "Preliminary Draft Event Operation Plan," and Gerdts agreed to issue Field Day a "conditional" Mass Gathering Permit by April 25, "pending review of Field Day's submissions on April 21, 2003." On March 24, Field Day received a letter from Gerdts acknowledging receipt of Field Day's permit application, and indicating that Field Day's plan was sufficient in scope to allow Field Day to begin advertising the Festival within fifteen days of the date of the letter.

In reliance on this letter, Field Day commenced a "massive advertising campaign and spent nearly $200,000 to promote the Festival"; began selling tickets "to fans located all around the country and abroad"; "contracted with bands to ensure their participation"; "hired and made deposits with contractor and production vendors for staging, lights, and sound"; purchased insurance; paid licensing fees; and "entered agreements with labor unions to construct the Festival Site and provide the various guest services that would be required at the Festival."

On April 11, 2003, Field Day met with representatives of the Riverhead Police Department, including Hegermiller, the Suffolk County Police Department, and the New York State Police. Field Day presented its initial plans for traffic control, transportation, and emergency communication, which it "formulated to conform to Hegermiller's decision to require uniformed police officers inside as well as outside the Event Site." Field Day's representative "walked the attendees through" its "Preliminary Transportation Plan," using a wall map of the site and handouts. Field Day stated that its Permit Application contemplated 60,000 attendees, but that it was more likely that 35,000 to 40,000 people would attend. Field Day also says it "established a working relationship with the involved agencies in continuing to further develop the plan."

That same day, Hegermiller allegedly sent a letter to Suffolk County Police Commissioner John Gallagher, with copies to the Riverhead Town Board and Riverhead Attorney's Office. Hegermiller's letter allegedly requested Gallagher's assistance for several events scheduled to occur at the Park that summer — including the Festival, "the Bonnaroo Music Festival," and the New York Air Show. The letter allegedly requested additional police

assistance to "fulfill Riverhead's law enforcement and public assistance obligations to Field Day" under the Licensing Agreement, and stated that although Field Day was providing its own on-site security,"preliminary estimates for police personnel [are] around 200, of which Riverhead could possibly supply around 50." The Plaintiffs allege that Hegermiller's request for 150 Suffolk County police officers "was not based on any standards found in the Sanitary Code or requirements under the New York Mass Gathering Laws," and that its provision of private security inside the site meant that the Riverhead Police Department could alone have provided a reasonable number of police officers to control traffic outside the site and to help with security inside the site. The Plaintiffs additionally allege that "[a]lthough Hegermiller estimated that the daily attendance for the Bonnaroo Festival and New York Air Show would be greater than the estimated attendance at Field Day, he did not provide specific police deployment numbers for those events." Nevertheless, Field Day agreed to Hegermiller's decision to request additional police officers from Suffolk County. According to the Plaintiffs, "[a]t no time did Hegermiller or any other public official inform Field Day that [procuring] additional law enforcement assistance from Suffolk County or elsewhere outside Riverhead would create a logistical or timing problem."

On April 15, 2003, Suffolk County officials allegedly convened a meeting in the County's legislative chambers to discuss "transportation, security, and communications." Field Day states that "[i]n addition to participants from previous meetings," this meeting was attended by representatives from the Suffolk County Executive Office, including Deputy Suffolk County Executive for Public Safety Joe Michaels, and Suffolk County Police Department Sergeant

Patrick Maher. Two days later, SCDHS sent Field Day a letter containing "a detailed list of requirements for a Mass Gathering Permit." A day after that, the New York State Police informed Field Day that they would not participate in the Festival, as a result of certain "political issues involving Riverhead."

On April 22, 2003, Field Day again met with representative from the Suffolk County and Riverhead Police Departments, and discussed plans relating to traffic, the deployment of officers and security guards, and the search and entry of ticket-holders and campers, as well as "other issues relating to emergency communications." At this meeting, "and in the presence of SCDHS officials," Hegermiller informed Field Day's representative that "SCDHS wanted to charge Field Day a fee of $2.5 million to process its Permit Application, rather than the $500 fee provided for by the permit application fee determination schedule"; this fee included the Suffolk County Police Department's estimated $245,616 cost for providing 150 police officers at the Festival. Gerdts also allegedly stated that he did not believe in "trickle-down economics," and that the Festival had "no redeeming value" to him.

In addition to the permit application processing fee, the Complaint alleges that Suffolk County and Riverhead now subjected Field Day to "numerous discretionary fees not required by New York Mass Gathering Laws," including $50,000 for "personnel and equipment" from the "Department of Transportation"; $15,000 for the assistance of a local fire department; $17,000 to connect the Festival to the Riverhead water system; and $22,864 per day "for a local hospital to be ready in case of emergencies." According to Field Day, Riverhead's Town Supervisor stated that "Riverhead now felt that it had not charged Field Day enough under the

License Agreement and the water system 'connection fee' was being imposed to remedy 'some of the difference.' " Field Day also states that it "was asked to re-pave roads leading to and from the entrances to the Festival," which had not been required of any previous event held at the Park.

On April 30, 2003, Field Day met with representatives from the Suffolk County and Riverhead Police Departments once more, and discussed plans relating to traffic and police deployment in greater detail; Field Day presented an updated version of its Transportation Plan, and "la[id] out in detail what it believed to be the key traffic control points surrounding the Event Site." Field Day alleges that it in reliance on "representations and discussions held at this meeting," it then created a "Traffic Control Point Staffing Spreadsheet" for inclusion into the Transportation Plan.

On May 5, 2003, Field Day met yet again with representatives from the Suffolk County and Riverhead Police Departments and discussed the "specific deployment of police officers inside the Event Site." At the conclusion of this meeting, officials from both police departments told Field Day that they would be meeting by themselves on May 8 to finalize the deployment plans, and that they would reconvene with Field Day the day after that to discuss the final deployment plan. According to the Plaintiffs, at no time did anybody at this meeting "hint to, let alone inform, Field Day that the procurement of law enforcement assistance from Suffolk County or any other entity would not be forthcoming." Likewise, "at no time during any of the preceding meetings did the Suffolk County Police Department ever indicate that it would not assist Riverhead with the Festival or that the procurement of that assistance would be a logistical

problem." "Relying on Defendants' representations at this and prior meetings," Field Day "believed that it had satisfied the obligations regarding traffic control, security and communications required to obtain a Mass Gathering Permit from the SCDHS more than 30 days prior to the commencement of the Festival."

The Plaintiffs allege that unbeknownst to them, throughout April and early May, Clear Channel Entertainment, Inc. by and through its vice president Ron Delsener, undermined Field Day's efforts to obtain a Mass Gathering Permit for the Festival. The Complaint states that Clear Channel Entertainment and its parent company Clear Channel Communications, Inc. are the Plaintiffs' primary competitors in the concert promotion industry and control other Long Island concert venues, and that Delsener has contacts with, and political influence over, upper-level public officials in Suffolk County and New York State. Delsener allegedly "sought to enlist the political support of [those] County and State officials and to urge the County to use its authority and political power to prevent Plaintiffs from staging the Festival." Specifically, Delsener allegedly sent a letter to Suffolk County Executive Robert Gaffney urging him to prevent the Festival from occurring; that Delsener telephoned the owner of a golf course near the Park to convince him to oppose the Festival in light of the "massive traffic and security problems" it would create for his business and other Riverhead residents; and that "a man who said he was from Clear Channel" called a local conservation organization and convinced it to file an (ultimately unsuccessful) motion for an injunction to prohibit the Festival for environmental reasons.

On May 9, 2003, Hegermiller called Field Day's "Project Manager" to inform him

that the final police deployment meeting scheduled for that day had been cancelled, that "Suffolk County officials were now demanding that the participation of the Suffolk County Police Department could only be effectuated through an inter-municipal agreement between Riverhead and Suffolk County," and that Suffolk County officials said that the County could not enter into such an agreement without first obtaining the Suffolk County legislature's approval. This was the first time that the issue of an "inter-municipal" agreement had been raised, and Field Day was surprised by this "turnaround" in light of the previous indications by Suffolk County police officials that they would assist Riverhead with the Festival.

But Field Day "was informed that there was still sufficient time" for Riverhead and Suffolk County to enter into the requisite "inter-municipal" agreement, and for the legislature to approve it. On the afternoon of May 9, 2003, Field Day's representative met with Deputy Suffolk County Attorney Robert Cabble and SCDHS representatives to "discuss issues that SCHDS felt were under the domain of the Suffolk County Attorney's office." Cabble promised to, but did not, "arrange to obtain the inter-municipal agreement," send it to the Riverhead Town Attorney, and "put Field Day in contact with Suffolk County's Risk Management Department to assure Field Day's compliance with liability insurance and financial certification requirements." Beginning on May 12, 2003, when Field Day had still not received a copy of any inter-municipal agreement or information about any insurance or financial requirements, its local counsel called Cabble "on at least three occasions" to inquire about these issues — but Cabble did not return these calls.

Field Day then sent its "police liaison and consultant," himself a former Suffolk

County Chief of Police, to meet with Police Commissioner Gallagher. The consultant reported back "that Gallagher conceded that the Suffolk County Police Department had refused to participate in the Festival for 'political' reasons"; the two met again soon after, and Gallagher stated that the deployment of Suffolk County police officers was "completely subject" to Suffolk County Executive Gaffney giving the "political green light."

On May 21, 2003, the Riverhead Town Attorney sent Cabble a letter stating that she had been advised that the legislature could hold a special meeting to approve the inter-municipal agreement; she request that the proposed inter-municipal agreement be forwarded to Riverhead, and that arrangements be made for a special meeting of the legislature. Cabble responded by letter the next day (with a copy to Gallagher), stating that "it appears that too little time remains to . . . hav[e] an approved cooperation agreement in place before the event," because "the actual language of the agreement must be negotiated," "the Riverhead Town Counsel must approve the agreement," and then "the agreement must be presented to the Suffolk County Legislature for its approval." According to this letter, legislative approval was highly unlikely, because it would require that a special meeting be noticed and convened by either the County Executive, who was opposed to the idea, or the Presiding Officer, who was out of state; and because "it is uncertain whether enough legislators to constitute a quorum can be assembled." Even if legislative approval were to occur at all, stated Cabble, it would not be until very close to the Festival's date, and "there is concern that a belated disapproval of the agreement would impair timely notification to ticket holders." In sum, stated Cabble, Suffolk County would not enter into a cooperation agreement to provide police services for the Festival. But according

to the Plaintiffs, "contrary to Cabble's representations, the Suffolk County legislature was scheduled to meet on or about June 4th to discuss the re-drawing of the voting districts," and thus "there was in fact a scheduled meeting of the legislature at which an inter-municipal agreement could have been approved."

On May 23, 2003, Gallagher sent formal notice to Hegermiller that Suffolk County would not enter into any agreement to provide police assistance for the Festival. At Principal Public Health Sanitarian Gerdt's request, Hegermiller wrote SCDHS to advise them that because of Suffolk's refusal to offer its assistance in implementing Field Day's proposed traffic control plan, he was unable to support the issuance of a Mass Gathering Permit for the Festival. Field Day "again offered to Hegermiller to pay for as many security officers and peace officers, including off-duty police officers and corrections officers, as necessary to satisfy Hegermiller's deployment requirements," but "Hegermiller again refused [its] offer." On May 27, 2003, Gerdts issued a letter denying Field Day's application for a Mass Gathering Permit in light of its failure to obtain a "statement from the county sheriff, State Police, New York State Department of Transportation or other law enforcement agency certifying that [its] traffic control plan is satisfactory." The Plaintiffs argue that in fact, Field Day did not need to obtain certification or formal approval for its traffic control plan, because under the relevant portion of the Mass Gathering Law (10 NYCRR 7-1.41(d)(2), a traffic control plan needs certification only if the event will have "transportation arrangements from noncontiguous parking facilities" — which the Festival would not.

On May 28, 2003, Field Day responded by letter to Gerdts, noting that his denial

of a permit was premature, as "Field Day was continuing to work with the Riverhead Police Department to secure sufficient numbers of police officers and law enforcement personnel that could be employed to effectuate the security and traffic control plans," and "believed that it could nevertheless obtain certification of the traffic control and safety plans prior to the 48-hour deadline provided by the Sanitary Code."

On June 4, 2003, Hegermiller informed the Riverhead Town Board that he no longer supported the Festival because of Suffolk County's refusal to provide police assistance; the Town then announced that it was withdrawing its support as well, and urged Field Day to cancel event. Riverhead's Supervisor explained that the reason was "an unexplained last minute decision" by "upper level County officials" not to participate in the Festival, despite "many months of cooperation and participation in various planning meetings."

By the time Field Day received notice of Riverhead's decision, it had sold over 55,000 tickets for the Festival at an average price of $80 per ticket, and had expended more than $3 million to book performers and promote and stage the Festival. "With fewer than 48 hours before the Festival was to commence, and with thousands of ticket-holders already in route" Field Day was forced to spend "substantial additional sums to secure an alternative venue," in order to mitigate its damages. Field Day was able to secure Giants Stadium (in New Jersey) for a one-day event, which it staged on June 7, 2003 at a "loss[] in excess of $5 million, including lost revenues, advertising costs, costs associated with . . . staging the Festival at an alternative venue, and injury to its business reputation, financial standing, and goodwill with artists, ticket buyers, . . . and the concert promotion industry." The Plaintiffs also claim that they continue to

be at risk from the Defendants' "continuing manipulation and application of the unconstitutional New York Mass Gathering Laws," and that "Defendants' conduct therefore continues to chill and interfere with Plaintiff's First Amendment rights to organize, promote, and stage future music festival events in Riverhead and elsewhere in Suffolk County and throughout New York State."

III.    *The Plaintiffs' Causes of Action, and the Pending Motions*

The Plaintiffs filed the present action on May 26, 2004.  The Second Amended Complaint lists as Defendants:  (1) Suffolk County, Suffolk County Executive Gaffney, Deputy Executive Michaels, the SCDHS, SCDHS Director Robert Maimoni, SCDHS Commissioner Harper, Suffolk County Police Commissioner Gallagher, Public Health Protection Bureau Chief Williamson, Principal Public Health Sanitarian Gerdts, Deputy Suffolk County Attorney Cabble, and Sergeant Maher of the Suffolk County Police — collectively referred to as the "County Defendants"; (2) the Town of Riverhead and Police Chief Hegermiller —  collectively referred to as "Riverhead"; and (3) New York State Health Commissioner Antonia C. Novello — hereinafter referred to as "the State."

The Second Amended Complaint lists twelve causes of action: (I) for a declaratory judgment that New York's Mass Gathering Laws are facially invalid under the First Amendment to the U.S. Constitution; (II) for an injunction preventing the Defendants from applying the Mass Gathering Laws in the future; (III) for a declaratory judgment that New York's Mass Gathering Laws are facially invalid under Article I, Section 8 of the New York Constitution; (IV) a Section 1983 claim against the "Individual Riverhead and Suffolk County Defendants' " for their

application of the Mass Gathering Laws; (V) a Section 1983 "*Monell*" claim against Suffolk County and Riverhead for their furtherance of unconstitutional policies; (VI) a Section 1983 civil conspiracy claim against all Defendants except the State and SCDHS Commissioner Harper; (VII) a claim against all Defendants except the State and Harper for violating Article I, Section 8 of the New York Constitution through their application of the Mass Gathering Laws; (VIII) a breach of contract claim against Riverhead; (IX) a "tortious interference with contractual relations" claim against all Defendants except the State, Harper, and Riverhead; (X) a "tortious interference with business relations" claim against all Defendants except the State, Harper, and Riverhead; (XI) a claim for prima facie tort against all Defendants except the State and Harper; and (XII) a negligence claim against all Defendants except the State and Harper.

As noted at the outset, each of the three groups of Defendants has moved to dismiss the claims against it; the Plaintiffs have also moved for a preliminary injunction to prevent further enforcement of the laws against them.

*DISCUSSION*

I.       *Dismissal motions: legal standards*

Generally speaking, when considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court must limit itself to the facts stated in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint. *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999). The court must accept the factual allegations contained in the complaint as true, and view the

pleadings in the light most favorable to the non-moving party, drawing all reasonable inferences in his favor. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S. 816 (1994). Dismissal under Rule 12(b)(6) is appropriate only if it appears beyond doubt that a plaintiff can prove no set of facts in support of his claim entitling him to relief. *Zerilli-Edelglass v. New York City Transit Auth.*, 333 F.3d 74, 79 (2d Cir. 2003).

II.     *The County Defendants' Motion To Dismiss Must Be Denied.*

  A.     *The Plaintiffs have standing to bring this action.*

Although the County Defendants focus their dismissal motion primarily on the substantive merits of the First Amendment and qualified immunity, they also raise the threshold issue of justiciability — specifically the Plaintiffs' purported lack of standing — which must be considered first. *See Can v. U.S.*, 14 F.3d 160, 162 n.1 (2d Cir. 1994) (justiciability, like subject matter jurisdiction, is "a threshold question"); *see also Elk Grove Unified Sch. Dist. v. Newdow*, 124 S.Ct. 2301, 2305 (2004) (plaintiff's lack of standing moots his First Amendment claims).

The doctrine of standing grows out of Article III of the U.S. Constitution, which limits the federal courts' jurisdiction to actual cases and controversies. *Allen v. Wright*, 468 U.S. 737, 750 (1984). At its "irreducible constitutional minimum," the doctrine of standing contains three elements: first, an "injury in fact" suffered by the plaintiff — that is, "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; second, there must be a causal connection between

the plaintiff's injury and the conduct complained of — that is, the injury must be "fairly traceable to the challenged action of the defendant," and not "the result of the independent action of some third party not before the court"; and third, it must be likely, not merely speculative, that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal quotations omitted). The party invoking the court's jurisdiction bears the burden of establishing these three elements. *Id.* at 561.

In support of its standing argument, the County correctly notes that a litigant generally lacks standing to raise another person's constitutional rights. *See Am. Fed'n of R.R. Police, Inc. (AFRP) v. Nat'l R.R. Passenger Corp. (AMTRAK)*, 832 F.2d 14, 18 (2d Cir. 1987). The County then asserts a corollary point: that the Plaintiffs lack standing because the complaint only asserts "that rights belonging to some other individuals, i.e., performers and patrons of the proposed concert, were violated" but "[t]here is no claim that any association rights or speech rights of these corporate plaintiffs were violated." The County further notes that "there is no claim alleged on behalf of the plaintiff, AEG Live, LLC, . . . [which] never had any contact with the Suffolk County Defendants and was not involved in the Mass Gathering Permit process." The County cites no authority that actually supports this argument, however, and the Court finds that it reaches too far.

The Supreme Court has held that a plaintiff challenging a prior restraint statute as facially offensive to the First Amendment *may* assert the rights of non-parties. *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956-58 (1984). "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit

of society — to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Id.* at 158. Thus, "it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license." *Freedman v. State of Md.*, 380 U.S. 51, 56 (1965). And in the context of "as applied" constitutional challenges under Section 1983, standing has likewise "been given a sufficiently broad interpretation in some circumstances to permit a litigant to assert the rights of another," as noted in a case cited the County itself. *See A.B.C. Home Furnishings, Inc. v. Town of East Hampton*, 947 F. Supp. 635, 641 (E.D.N.Y. 1996) (corporation that arranged charitable auction on town land has standing to sue town on behalf of charity for allegedly unconstitutional revocation of permit).

The County's argument also runs directly counter to the line of Supreme Court cases holding that a speaker need not "generate, as an original matter, each item featured in the communication," in order to enjoy First Amendment protection, and "does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 569-70 (1995) (parade organizer enjoys First Amendment protection to select parade parts based on identity or message) (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) ("Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment."); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (newspapers'

presentation of edited compilation of speech generated by other persons is squarely within core of First Amendment security); *New York Times Co. v. Sullivan*, 376 U.S. 254, 266 (1964) (newspaper's publication of editorial-type advertisements protected by First Amendment)).

In this case, Field Day's own speech rights were allegedly harmed by the actions of the County Defendants, and Field Day is challenging the enforcement of a prior restraint on speech. Thus, there is no merit to the County's assertions that Field Day lacks standing to present this claim.

B. *Qualified immunity cannot be applied at this juncture.*

The County Defendants base their dismissal motion primarily on the contention that they (or their individual members) are entitled to qualified immunity, because their actions were taken pursuant to a valid law, and "there is no allegation that the County defendants breached any of the plaintiffs' clearly established rights." In arguing against dismissal on this basis, the Plaintiffs assert that *any* enforcement of the Mass Gathering Law violates their clearly established rights per se, and also that the way in which the Defendants actually did apply the law violated their clearly established rights as well.

Contrary to the Parties' respective suggestions, qualified immunity may neither be ruled out per se, nor applied per se, merely because the Defendants enforced the Mass Gathering Law. Instead, because the Plaintiffs allege that the County Defendants breached their clearly established rights by actually *mis*applying or manipulating the law, qualified immunity — and thus dismissal — cannot be granted at this juncture.

1. *Qualified immunity: legal standards*

Section 1983, pursuant to which the Plaintiffs bring their Fourth and Sixth causes of action against the individual County Defendants, provides a vehicle for civil suits for damages against any person who, acting under color of state law, deprives another person of a right, privilege or immunity secured by the Constitution or the laws of the United States. *See* 42 U.S.C. § 1983. However, the doctrine of qualified immunity shields a government official from such suits for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kerman v. City of New York*, 261 F.3d 229, 236 (2d Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The applicability of qualified immunity is determined in several steps.

"The first step in any [1983]claim is to identify the specific constitutional right allegedly infringed," *Singer v. Fulton County Sheriff*, 63 F.3d 110, 115 (2d Cir. 1995), and the specific constitutional standards governing that right, *see Spiegel v. Rabinovitz*, 121 F.3d 251, 254 (7th Cir. 1997), and then to determine whether, when taken in the light most favorable to the plaintiff, the facts alleged show that the defendant official's conduct violated that constitutional right at all. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). This is a legal, not factual, inquiry. *Genas v. State of N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 830 (2d Cir. 1996). If, even assuming that all of the allegations in the complaint are true, the plaintiff has not established the defendant-officer's violation of any constitutional right, there is no need for further inquiry. *Saucier*, 533 U.S. at 201.

If the plaintiff *has* alleged a cognizable violation of a constitutional right, the next inquiry is whether that right was "clearly established" at the time of its violation. *Saucier*, 533

-23-

U.S. at 200-01. This too is a question of law, *Kerman v. City of New York*, 374 F.3d 93, 108-09 (2d Cir. 2004), and the defendant official has the burden of proof. *See Shechter v. Comptroller of City of New York*, 79 F.3d 265, 268-69 (2d Cir. 1996). Generally speaking, a right is clearly established if (1) the Supreme Court or the relevant federal appellate court (2) has defined its contours with "reasonable specificity" (3) such that a reasonable official would have understood that his acts were unlawful. *See African Trade & Infor. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002); *and Danahy v. Buscaglia*, 134 F.3d 1185, 1190 (2d Cir. 1998). Phrased differently, "the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act"; but if any reasonable trier of fact could find that the official's actions were objectively *un*reasonable, then dismissal of the case on the basis of immunity is impermissible. *See Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995).

As the Second Circuit has noted, "determining whether a right is 'clearly established' is not subject to mathematical precision," and "[t]he recurring difficulty" lies in "articulating the right in relation to the factual situation at hand." *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 250-51 (2d Cir. 2001). Two principles guide this part of the analysis. First, "in ascertaining whether the right was clearly established with respect to a given situation, a court must consider 'not what a lawyer would learn or intuit from researching case law, but what a reasonable person in [the government actor's] position should know' about the appropriateness of his conduct under federal law." *Id.* at 251 (quoting *Young v. County of Fulton*, 160 F.3d 899, 903 (2d Cir. 1998).

The second principal of "clearly established law" is that "the absence of legal precedent addressing an identical factual scenario does not necessarily yield a conclusion that the law is not clearly established." *Id.* "The Supreme Court has made it clear . . . that government officials are not liable for constitutional violations only when 'the very action in question has previously been held unlawful.' " *Lauro v. Charles*, 219 F.3d 202, 215 (2d Cir. 2000) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "Indeed, it stands to reason that in many instances 'the absence of a reported case with similar facts demonstrates nothing more than widespread compliance with' the well-recognized applications of the right at issue on the part of government actors." *Johnson*, 239 F.3d at 251 (quoting *Eberhardt v. O'Malley*, 17 F.3d 1023, 1028 (7th Cir. 1994)). As the Seventh Circuit has stated, the issue is simply, at its most basic level, whether "reasonable persons standing in the defendants' shoes at the time would have reached just such a conclusion." *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996).

A qualified immunity defense may be presented, but "faces a formidable hurdle" in a Rule 12(b)(6) motion, and is usually not successful. *See McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004). As with any Rule 12(b)(6) dismissal motion, the court must accept all of the complaint's material allegations as true, and draw all reasonable inferences in favor of the plaintiff. *See Velez v. Levy*, 401 F.3d 75, 100 (2d Cir. 2005). Rule 12(b)(6) dismissal on qualified immunity grounds is only permitted where the basis for qualified immunity is established by the face of the complaint itself, and it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *McKenna*, 386 F.3d at 435-36 (citing *Green v. Maraio*, 722 F.2d 1013, 1019 (2d Cir. 1983), and *Citibank,*

*N.A. v. K-H Corp.*, 968 F.2d 1489, 1494 (2d Cir. 1992)). That is, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna*, 386 F.3d at 436.

2.      *The Plaintiffs' claims*

Fairly read, the Complaint asserts that the individual County Defendants violated the Plaintiffs' First Amendment free speech and association rights by improperly refusing to issue them the mass gathering permit needed to hold their Festival.

Specifically, the Complaint alleges that some or all of the County defendants attended multiple meetings where Field Day presented its plans for the festival — including its plans to use Suffolk County police officers to direct traffic or maintain security, as demanded by Riverhead — and voiced no objections. Defendant Gerdts, the Principal Public Health Sanitarian, even indicated to Field Day that its mass gathering permit application looked sufficiently good that it could begin advertising. Once preparations for the Festival began in earnest, however, the Defendants began putting pitfalls in the way: first the demand by Riverhead Police Chief Hegermiller that Field Day obtain 150 police officers from the County; then requests for further information as to the security and health plans; and then demands for various exorbitant fees in order to pay the additional police, and provide other safety or health services. Later, the Defendants demanded that the participation of Suffolk's police department could only be effectuated through an "inter-municipal agreement" with legislative approval — and then misleadingly indicated that this would be impossible. In the end, Gerdst refused to issue a mass gathering permit because Riverhead Police Chief Hegermiller had refused to certify that the

Festival's traffic control plan was satisfactory — but such certification was actually not required under the Mass Gathering Law, as there were to be no non-contiguous parking facilities.

According to the Complaint, the Plaintiffs' efforts to obtain cooperation from Suffolk County, and ultimately to obtain the permit, were "completely subject to Defendant Robert Gaffney, the Suffolk County Executive, giving the political 'green light' for Suffolk's participation," but were stymied "for political reasons"; either because the Plaintiffs' main business rival was applying political pressure in the County to derail the Festival; or because the Defendants disliked the rock or rap music, artists, and fans that were likely to be at the Festival, and felt that the Festival had no "redeeming value."

In sum, allege the Plaintiffs, their good faith efforts to obtain the needed mass gathering permit were thwarted at every turn by politically motivated, unreasonable, and capricious demands that were imposed under the guise of the Mass Gathering Law, but that were not actually based on its provisions.

3.      *Enforcement of the Mass Gathering Law was not per se unreasonable.*

As an initial matter, the Plaintiffs argue that the Mass Gathering Law is so "patently unconstitutional" that enforcing it was "objectively unreasonable," as "any reasonable permit-issuing official *would* have known"; the Plaintiffs accordingly suggest that the Defendants have automatically forfeited their right to qualified immunity. The Court must reject this argument.

As the County notes, duly enacted state laws are generally presumed to be constitutional; this is "one of the first principles of constitutional adjudication." *Lemon v.*

-27-

*Kurtzman*, 411 U.S. 192, 208 (1973). Officials charged with enforcing a statute are thus "generally entitled to rely on the presumption that all relevant legal and constitutional issues have been considered and that the statute is valid," and "notwithstanding potential or even foreseeable constitutional challenge, '[u]ntil judges say otherwise, . . . have the power to carry forward the directives of the state legislature." *Conn. ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 102, 105 (2d Cir. 2003) (citing *Lemon*, 411 U.S. at 208) (quotations omitted).

In fact, the Second Circuit has extended qualified immunity to officials who may have, before enforcing a law, actually questioned its constitutionality, "received some legal advice suggesting that [it] would likely fail a constitutional challenge," or known of "the likelihood of litigation if enforcement continued." *Id.* 106-07. Officials, the Circuit has explained, should not face the dilemma of "having to choose between two equally hazardous (and potentially litigious) alternatives," either "enforc[ing], pursuant to official duties, a potentially (although not plainly) unconstitutional statute," or "opt[ing] not to enforce, in possible dereliction of official duties, a potentially (although not clearly) constitutional statute"— particularly "where the stakes may be high on both fronts." *Id.* at 107. Enforcement of the Mass Gathering Law necessarily presents such high stakes, as it tends to pit free association rights against the State's interest in protecting public health and safety.

There is, as the Plaintiffs' argument suggests, a "possible exception" where the law in question is "plainly unlawful," *Lemon*, 411 U.S. at 208-09, or "so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979). The Plaintiffs suggest that this exception

extends to "a permitting statute that lacks adequate limits on discretion" or "laws that vest unbridled discretion in the hands of government officials who have the power to grant or deny a license or permit to engage in expressive activity." In support of this point, the Plaintiffs cite two district court cases: *Nichols v. Village of Pelham Manor*, 974 F. Supp 243 (S.D.N.Y. 1997), and *Schroeder v. City of Rolling Meadows*, No. 93 Civ. 6073, 1995 WL 29605 (N.D. Ill. Jan. 24, 1995).

Both *Nichols* and *Schroeder* involve laws that unconstitutionally conditioned door-to-door distribution of pamphlets on the obtainment of a license from an authority with unfettered discretion; both cases hold that the laws were sufficiently "blatant" in their unconstitutionality that qualified immunity should not extend to police officers enforcing them. *See generally id.* But the Supreme Court has noted that the First Amendment's free speech guarantees were a response, above all else, to Sixteenth and Seventeenth Century English laws imposing prior restraints on pamphleting. *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320 (2002). The Court has thus often stressed "the privileged status [that] peaceful leafletting enjoys in our free speech tradition." *Hill v. Colo.*, 530 U.S. 703, 786 (2000) (Kennedy, J., dissenting). "[H]anding out leaflets in the advocacy of a politically controversial viewpoint . . . is the essence of First Amendment expression," and laws that burden such "core political speech" are subjected to "exacting scrutiny." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995).

Restrictions on potentially expressive activity in a public forum, by contrast, are somewhat less strictly scrutinized. *See Thomas*, 534 U.S. at 320-24. The government's restrictions must be limited to the enforcement of "reasonable time, place, and manner

-29-

regulations" that are "content-neutral," "narrowly tailored to serve a significant government interest," and that "leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). But the D.C. Circuit has noted that "narrow tailoring is not an exact science," and government officials "should not be expected to perform that analysis" prior to enforcing "an ostensibly lawful time, place, and manner restriction governing expressive activity in a public forum." *Lederman v. U.S.*, 291 F.3d 36, 47 (D.C. Cir. 2002).

At least two federal circuit cases striking down rather apparently unconstitutional licensing requirements for demonstrating or gathering in public fora have nevertheless extended qualified immunity to officers enforcing such laws. In *Lederman v. U.S.*, the D.C. Circuit struck down a law banning demonstrations in front of the Capitol, finding the "sheer breadth" of the law "astonishing"; but the court nevertheless extended qualified immunity to the officer who arrested the plaintiff for violating it. *See id.* Similarly, in *Grossman v. City of Portland*, the Ninth Circuit held that there was "no justification for the overly broad sweep" of a city ordinance prohibiting demonstrating in public parks without a permit, and that its lack of narrow tailoring was "particularly conspicuous"; but the court nevertheless held that it "was not so obviously unconstitutional as to require a reasonable officer to refuse to enforce it." 33 F.3d 1200, 1206-10 (9th Cir. 1994). The Second Circuit has cited both *Lederman* and *Grossman* to support its holding that, generally, a government officer is entitled to presume that the law he enforces is constitutional. *See Conn. ex rel. Blumenthal v. Crotty*, 346 F.3d 84, 103 (2d Cir. 2003).

In light of this precedent, even assuming that holding a concert or music festival

is as closely related to protected speech as a political demonstration or protest, the Mass Gathering Law cannot be said to reach the level of "blatancy" necessary to per se strip its enforcers of qualified immunity.  In sum, both *Nichols and Schroeder* are easily distinguished by law and fact from the present case, and the individual Defendants did not forego qualified immunity simply by (properly) enforcing the Mass Gathering Law.

4.    *The Plaintiffs have alleged the violation of a constitutional right.*

Addressing the first portion of the qualified immunity analysis, the County Defendants argue that the Plaintiffs have failed to allege the violation of any constitutional right at all, because the Mass Gathering Law "[is] constitutional and w[as] constitutionally applied." This argument fails on both levels.

The first portion of the County's argument seems to suggest that simply because the Mass Gathering Law *is* constitutional, enforcing it against the Plaintiffs was reasonable per se, and entitles the Defendants to qualified immunity.  This is the exact inverse of, and at least as unpersuasive as, the Plaintiffs' argument discussed immediately *supra*.  The County stresses that the government's interests in protecting the public may outweigh individual interests in expressive activity, and describes the Mass Gathering Law as containing "content neutral," "reasonable regulations to protect the public health, welfare, and safety."  "Clearly," the County posits, "application of such a well-supported statute and regulations cannot form the basis of an 'as applied' challenge."  Thus, they suggest, qualified immunity is unquestionably appropriate. The Court has already, as noted *supra* at footnote 1, found that portions of the Mass Gathering Law are in fact constitutionally objectionable as written.  But assuming for the sake of argument

that the law is as "reasonable" and "well-supported" on its face as the County claims, that of course cannot mean that an official is free to enforce it in any manner he chooses.  It seems too obvious to state, but apparently is not, that a constitutional law must be enforced in a constitutional manner; for if the facial validity of a law was all that mattered, there would be no such thing as an "as applied" challenge.

The second portion of the County's argument is that because the Defendants *did* in fact *properly* apply the Mass Gathering Law, they could not have violated any of the Plaintiffs' constitutional rights.  The County asserts that in order to receive a mass gathering permit the Plaintiffs were obliged to, but did not, timely provide adequate traffic safety and police protection plans; the County insists that this is the only reason why a permit was not issued.  This point fares little better than the previous one; for as the Plaintiffs note, it is a factual assertion, and a defendant's factual assertions are "entirely irrelevant" in the adjudication of a motion to dismiss.  The Plaintiffs have alleged facts suggesting that the Defendants, based on improper political considerations, *intentionally* applied the law *incorrectly* in order to thwart the Plaintiffs' efforts to obtain a mass gathering permit in compliance therewith, and thus interfered with the Plaintiffs' ability to conduct expressive or associational activities.[5]  This would, if

---

[5]     The County urges this Court to follow *A.B.C. Home Furnishings, Inc. v . Town of East Hampton*, 947 F. Supp 635 (E.D.N.Y. 1996), which dismissed a plaintiff's First Amendment claims on a Rule 12(b)(6) motion, after determining as a matter of law that a town's revocation of a permit was an effort to regulate "the Event, *i.e.*, the activity underlying the speech, not the speech itself." *Id.* at 643.  In asserting that *A.B.C.* presents similar issues as this case, the County overlooks the facts that the event cancelled in *A.B.C.* was a *sale of merchandise* — a much more strictly commercial enterprise than a concert. *Id.  A.B.C.* is accordingly unpersuasive.

established, be unconstitutional.[6]  *See, e.g., Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325

(2002) (selectively enforcing permit rules for holding large gatherings in park against disfavored

speakers "would of course be unconstitutional").

      5.    *The Plaintiffs' allegations indicate that the Defendants unreasonably violated a clearly established constitutional right.*

As a general rule, the proper enforcement of a presumptively valid statute "creates

a heavy presumption in favor of qualified immunity."  *Conn. ex rel. Blumenthal v. Crotty*, 346

F.3d 84, 104 (2d Cir. 2003).  But it is also "clearly established that *selective enforcement* of a

facially valid law based on an official's dislike of protected expression is unlawful."

*Sidepockets, Inc. v. McBride*, No. 03 Civ. 742, 2004 WL 555238, at *3 (D. Conn. March 15,

2004) (emphasis added) (citing *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d

587 (2d Cir. 1994), and *Brady v. Town of Colchester*, 863 F.2d 205, 217 (2d Cir. 1988)).  For

example, "[t]he Supreme Court and the Second Circuit have long prohibited selective

enforcement of an otherwise facially valid state regulation in retaliation for speaking out against

government practices."  *Scott v. Goodman*, 961 F. Supp. 424, 447 (E.D.N.Y. 1997) (government

agency's selective enforcement of workplace rule barring adornments on employee uniforms

---

      [6]    The County also characterizes the Plaintiffs' argument as claiming a "right to utilize the Suffolk County Police Force for the proposed music festival."  This distorts the Plaintiffs' arguments. The Plaintiffs are not asserting that they had a unilateral right to use the police force; rather, they are asserting that the Defendants (1) needlessly insisted that the Plaintiffs obtain extra police assistance as a condition of obtaining a permit, (2) indicated that obtaining such assistance from the Suffolk County Police Department would be possible, (3) then capriciously imposed a variety of roadblocks to getting such assistance, and (4) eventually refused it entirely, (5) all on the basis of improper political or "cultural" considerations.  These assertions are part and parcel of the Plaintiffs' overall allegation that the Defendants together colluded to prevent Field Day from obtaining a mass gathering permit.

only against employees wearing buttons with particular message violates clearly established constitutional right). And as noted in the preceding section of this discussion, the Supreme Court has explicitly stated that making the obtainment of a mass gathering permit more difficult for disfavored applicants "would of course be unconstitutional." *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 325 (2002).

It is thus hard to fathom how *any* reasonable official in the individual County Defendants' shoes could have *possibly* believed that he was acting in a constitutionally permissible fashion by misleading the Plaintiffs as to the likelihood of, and requirements for, obtaining a mass gathering permit, imposing special impediments on them, and basing the denial of such permit on a mis-application of the law (namely, requiring certification of traffic plans for *contiguous* parking facilities). In sum, based on the allegations in the Complaint, qualified immunity is unavailable at this stage of the proceedings, and the County's motion to dismiss must be denied.

III.    *Riverhead's Motion To Dismiss Must Be Denied.*

A.    *The Plaintiffs have sufficiently stated a claim for breach of contract.*

The Plaintiffs' Eighth Cause of Action alleges that Riverhead breached its obligations under the License Agreement signed by Field Day and the Community Development Agency (CDA) on February 20, 2003. Specifically, the Complaint alleges that "[i]n breach of its obligations, CDA actively and maliciously hindered Field Day's efforts to obtain a Mass Gathering Permit and hold the Festival, including but not limited to willfully failing to provide

'sufficient police protections' in connection with the festival." Complaint ¶132.  In moving to dismiss, Riverhead argues that Field Day's obtaining a mass gathering permit was a condition precedent to the agreement — and thus, that the license agreement became null and void when Field Day failed to obtain the permit.  Alternatively, Riverhead asserts that the agreement "only required Riverhead to provide police to direct highway and road traffic," and that it was Field Day's responsibility to provide any additional security.  Both arguments fail, for largely the same reasons.

Riverhead bases its first argument on the License Agreement,[7] which as it notes, states in part that Field Day "will secure a 'Mass Gathering Permit,' " that such permit is a "Necessary Approval," and that if "[Field Day] is unsuccessful in obtaining the Necessary Approvals, . . . then this Agreement shall terminate, and the obligations of each party herein shall be null and void."  Obtainment of a Mass Gathering Permit was thus, as the Plaintiffs admit, a condition precedent to Riverhead's obligations under the License Agreement.  *See Kapson Constr. Corp. v. ARA Plumbing & Heating Corp.*, 642 N.Y.S.2d 701, 701 (App. Div. 1996) ("A condition precedent is an act or event other than a lapse of time, which unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.").

As the Plaintiffs note, though, "a party cannot assert non-fulfillment of a condition precedent when that party itself frustrated the condition's occurrence."  *See Kooleraire Serv. & Installation Corp. v. Bd. of Educ.*, 28 N.Y.2d 101, 106-07 (1971).  According to the

---

[7]      As a document referenced in the Complaint, the Court may consider the License Agreement as evidence on a motion to dismiss.  *See* Part I, *supra*.

Plaintiffs, Riverhead and Police Chief Hegermiller defeated Field Day's efforts to secure the necessary permit, by "arbitrarily requiring 200 police officers to patrol the Festival," refusing Field Day's offer "to secure and pay for as many security, police, or corrections officers as Riverhead required," and then urging Suffolk County authorities to refuse to issue a permit "on account of [Field Day's] failure to fulfill the very level of police staffing that Riverhead itself had arbitrarily imposed." Thus, state the Plaintiffs, the allegations in the Complaint indicate that "Riverhead's own conduct caused the non-occurrence of the condition precedent," which thus "cannot be asserted by Riverhead in defense to Field Day's breach of contract claim."

Riverhead offers several arguments in response. First, Riverhead argues that "[a]llegations that Suffolk County refused to issue the Permit because Riverhead refused to certify [Field Day's] traffic control plans do not make out a claim against Riverhead," since "[t]he plaintiffs admit that such certification was not necessary." While this argument is technically correct, it overlooks the allegations that Riverhead or Hegermiller, while not required to certify the plans, nonetheless went out of their way, at the behest of Suffolk County, to affirmatively stress their opposition to the issuance of a permit. See Complaint ¶75.

Riverhead next argues that "the complaint lacks any allegations demonstrating that Riverhead 'actively and maliciously hindered Field Day's efforts to obtain a Mass Gathering Permit and to hold the Festival.' " "On the contrary," states Riverhead, "the complaint is replete with examples of Riverhead working with, and assisting Field Day in obtaining the Permit."[8] It

---

[8]     Riverhead also argues that, as a matter of law, it could not have "caused the non-occurrence" of the condition precedent to its fulfillment of the terms of the licensing agreement,

has already been stated, *see* Part I, *supra*, but merits repeating: the court adjudicating a Rule 12(b)(6) motion to dismiss must accept the factual allegations contained in the complaint as true, and view the pleadings in the light most favorable to the non-moving party, *drawing all reasonable inferences in his favor*. *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994). That is, the Court must "liberally construe the complaint." *Attorney Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 106 (2d Cir. 2001). The complaint, read as a whole with all inferences drawn in its favor, clearly *does* suggest that Riverhead worked to stymie Field Day — even if it at first worked on Field Day's behalf, or appeared to. At this stage of the proceedings, the Plaintiffs need not "demonstrate" with exactitude how or why.

Finally, Riverhead asserts that it could not have breached its obligations to supply sufficient police protection to the Festival, because the license agreement only required it to provide police to direct highway and road traffic. This argument is, as the Plaintiffs note, based on a debatable reading of the license agreement.[9] But assuming that Riverhead's reading is accurate, the Plaintiffs argue, "Riverhead did not provide *any* security because it withdrew all

---

"because Riverhead had no authority to deny the Permit or cause the Permit to be denied." This is an interesting argument, but because Riverhead cites absolutely no authority to support it, the Court will not consider it.

[9]     Paragraph 4 of the agreement, entitled "Responsibilities of Licensee," states in relevant part that "[s]ubject to the terms of this Agreement," Field Day "will be responsible for carrying out and shall have exclusive control of all operations associated with the Event and related activities, including . . . security for the event (other than the officials of the Town Police Department which shall be arranged and provided by the CDA)." Paragraph 6, entitled "Responsibilities and Obligations of CDA," states in relevant part that "CDA acknowledges and agrees that it shall provide sufficient police protection (including necessary barriers and bike racks); and any necessary road signs for purposes of directing highway and road traffic only."

support just days before the festival." In reply, Riverhead reiterates that all rights and obligations under the licensing agreement were conditioned on Field Day's obtainment of a Mass Gathering Permit; since Field Day failed in this regard, Riverhead asserts that its obligation to provide traffic control police was nullified. This argument in essence is a return to square one: Field Day's failure to fulfill a condition precedent. In light of the allegations in the Complaint, the plausibility that Riverhead itself contributed to Field Day's inability to fulfill this condition precedent has already been established, and there is no need to belabor the point further.

In sum, the Plaintiffs have managed to state a sufficient claim of breach of contract to survive Riverhead's Rule 12(b)(6) motion.

B.    *The Plaintiffs state a cognizable claim for "Monell liability."*

Riverhead argues that the Plaintiffs' Fifth Cause of Action, for "*Monell* liability," must fail because "the plaintiffs have failed to allege facts showing the existence of any policy or procedure followed by Riverhead or its employees that would violate the plaintiffs' rights." Riverhead also argues that "there are simply no factual allegations demonstrating that Riverhead, or its employees, imposed arbitrary requirements," "refused to provide County police," "misled the plaintiffs in any manner," or "solicited or improperly influenced any government official."[10] This argument fails, however, because there *are* such allegations.

---

[10]    Additionally, Riverhead argues that the Complaint's allegations that it "[a]ppl[ied] [the Mass Gathering Law] so as to deny Plaintiffs a Mass Gathering Permit" must fail as it was not within Riverhead's authority to grant or deny the permit. *See* Complaint ¶116(a), (b). The Plaintiffs appear to concede this point, which is apparently directed at the County Defendants only; accordingly, the Court will only address the sufficiency of the remaining factual allegations related to *Monell* liability.

Contrary to the Plaintiffs' suggestion, "complaints alleging a tort against municipalities under 42 U.S.C. § 1983 are *not* sufficient merely because they meet the liberal standard of notice pleading that applies in most civil cases." *Finkelstein v. City of New York*, 543 F. Supp. 161, 163 (S.D.N.Y. 1982). Rather, "[c]omplaints relying on civil rights statutes are plainly insufficient unless they contain some specific allegations of fact indicating a deprivation of civil rights, rather than state simple conclusions." *Koch v. Yunick*, 533 F.2d 80, 85 (2d Cir. 1976).

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court rejected the doctrine of respondeat superior as a basis for imposing civil rights liability on a municipality; the Court instead held that a municipal agency may not be held liable under Section 1983 simply for the "isolated unconstitutional acts of its employees." *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) (discussing *id.*). Section 1983 liability may be imposed upon a municipality, however, if the plaintiff can demonstrate that he suffered constitutional harms because of a "municipal policy or custom." *Monell*, 436 U.S. at 690-91.

A municipal policy or custom "need not be contained in an explicitly adopted rule or regulation," *Sorlucco*, 971 F.2d at 870, or have "received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 691. And "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," whether "that action is to be taken only once or to be taken repeatedly." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 481 (1986). However, the Supreme Court

has explained that not every decision by municipal officers — even those considered "policymakers" and exercising their discretion — gives rise to municipal liability; rather, "[m]unicipal liability attaches only where the decisionmaker possesses *final authority* to establish municipal policy with respect to the action ordered." *Id.* at 481-82 (emphasis added). Alternatively, "a municipality also can be liable for an isolated constitutional violation if the final policymaker 'ratified' a subordinate's actions." *Christie v. Iopa*, 76 F.3d 1231, 1238 (9th Cir. 1999) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). While "policymaker" status is generally determined as a matter of state law, *see McMillian v. Monroe County, Ala.*, 520 U.S. 781, 785-86 (1997), ratification is generally a question of fact. *See Christie*, 76 F.3d at 1239.

In the present case, the facts alleged by the Plaintiffs indicate that their civil rights *were* violated through a municipal policy. Firstly, Riverhead appears to concede that Hegermiller was a policymaker. The Complaint indicates that Hegermiller (capriciously) made the final decision to demand a 200-officer police presence at the Festival as a precondition of lending his support or endorsement to its Mass Gathering Permit application. The Complaint further indicates that Hegermiller then took it upon himself to write the SCDHS and inform them that he would not support Field Day's permit application absent Suffolk County's provision of 150 police officers to help fulfill his previous demand. Additionally, the Complaint alleges that Hegermiller unilaterally refused Field Day's offer to pay for off-duty police or corrections officers to staff the Festival instead. Finally, even assuming that Hegermiller did not act in a policymaking capacity, the Complaint indicates that Riverhead's Town Board or its Supervisor

ratified his decisions.  See Complaint §§81-82.

If it is true, as the Complaint suggests, that Hegermiller or Riverhead did these things because of the Plaintiffs' political connections (or, more accurately, the political connections of their business rival), or because the Defendants disliked the performers, music, and attendees likely to be at the Festival, then the Plaintiffs *have* sufficiently claimed that Riverhead had a policy of violating their First Amendment rights for municipal liability to lie under *Monell*.

      C.    *The Plaintiffs have sufficiently alleged a "civil rights conspiracy."*

Riverhead asserts that the Plaintiffs have failed to state a claim for civil conspiracy under Section 1983, because "Riverhead is not even mentioned in the relevant allegations," and "the allegations related to this claim against defendant Hegermiller are conclusory and completely unsupported."  Riverhead's arguments are unpersuasive.

To prove a conspiracy cognizable under Section 1983, a plaintiff must show: "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."  *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999).  The overt act need only be committed by one of the co-conspirators.  *See Saine v. A.I.A., Inc.*, 582 F. Supp. 1299, 1307 (D. Colo. 1984).  While the plaintiff must offer more than "conclusory allegations" of these elements to survive a motion to dismiss, "conspiracies are by their very nature secretive operations," and "may have to be proven by circumstantial, rather than direct, evidence."  *Pangburn*, 200 F.3d at 72.

The Plaintiffs' Sixth Cause of Action "reallege[s] and incorporate[s] by reference" all preceding parts of the Complaint. It then alleges that Hegermiller, acting under color of state law and in furtherance of official policy, conspired with the County Defendants to deprive the Plaintiffs of their First Amendment rights. Finally, the Complaint alleges the following overt acts: "[c]onditioning approval of Field Day's Permit Application on a demand for additional police assistance and then imposing an extortionate $245,616 per day fee to provide the additional police officers"; "[d]emanding an inter-municipal agreement to provide additional police officers and then refusing to enter into such an agreement"; and "[a]sking Defendant Hegermiller to write a letter stating that Field Day's traffic control plan was unsatisfactory and then using that letter to justify the denial of Field Day's Permit Application."

The Court finds that these allegations, considered in light of the rest of the Complaint incorporated by reference, more than suffice to state a cognizable conspiracy — at least at the pleadings stage. The fact that Riverhead is not specifically mentioned in the portion of the Complaint alleging conspiracy is of no import — first, since Riverhead Chief of Police Hegermiller *is* mentioned, and second, since alleging an overt act by *any* of the Defendants (in tandem with the ample circumstantial evidence in the rest of the Complaint suggesting Riverhead's agreement) is adequate.

As a final point, Riverhead argues that the Plaintiffs' assertions of a conspiracy are "simply not credible based on the numerous allegations in the complaint that demonstrate Riverhead's assistance and cooperation with Field Day during the application process." "Far from conspiring against the plaintiffs," insist the Town Defendants, "it is clear that Riverhead

endeavored to assist them." This argument, which by its own words speaks to the credibility of the Plaintiffs' factual allegations, is simply irrelevant on a motion to dismiss and is instead properly raised at trial. As Riverhead fails to offer any real reason why the Plaintiffs' conspiracy claim must fail *as a matter of law*, its motion to dismiss this cause of action must fail.

       D.      *The Plaintiffs have alleged a cognizable state constitutional claim.*

Riverhead's next assertion is that the Plaintiffs fail to state a claim for violation of Section 8 of the New York Constitution, which states in relevant part: "Every citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press." McKinney's Const. Art. 1, § 8. Free speech claims under this Section are generally governed by the same standards as free speech claims under the First Amendment of the federal constitution. *See Markovic v. New York City Sch. Constr. Auth.*, No. 99 Civ. 10339, 2002 WL 22043, at *9 (S.D.N.Y. Jan. 08, 2002) (collecting cases).

The Complaint alleges, in relevant part, that Riverhead, Hegermiller, and the County Defendants together deprived the Plaintiffs of their free speech and association rights under Article 1, Section 8 of the New York Constitution by, *inter alia*, "[m]anipulating and misapplying" the Mass Gathering Law, "[i]mposing arbitrary requirements to obtain certification of traffic control and civil defense plans," "[m]isleading Plaintiffs about and misrepresenting the procedures and timing for obtaining certification of traffic control and civil defense plans," and "[s]oliciting and improperly influencing other local, county, and state government officials to

commit these and other deprivations of Plaintiffs' free speech and association rights."[11]

Riverhead argues that this cause of action should be dismissed "for similar reasons to their fifth cause of action [for *Monell* liability]"; namely, that "[n]othing in the complaint demonstrates that Riverhead "imposed arbitrary requirements," "refused to provide police protection," "misled the plaintiffs," or "solicited or improperly influenced any government officials." As already discussed in the preceding section of this opinion, the Plaintiffs have stated a colorable cause of action for *Monell* liability. And as noted several times already in response to Riverhead's other arguments, the Complaint need only state sufficient factual allegations to allow a reasonable inference that the Defendants violated its free speech and association rights by abusing the law — and it has. The Complaint need not "demonstrate" that its factual allegations are true. This cause of action cannot be dismissed.

E. *Plaintiffs' prima facie tort claim cannot be dismissed.*

Riverhead argues that the Plaintiffs' Eleventh Cause of Action fails to state a legitimate claim for prima facie tort against Riverhead. A cause of action for prima facie tort requires a showing of "(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, (4) by an act or series of acts that would otherwise be lawful." *Curiano v. Suozzi*, 469 N.E.2d 1324, 1327 (N.Y. 1984). The general principle behind this form

---

[11]    The Plaintiffs also argue that Riverhead violated their free speech and association rights under the New York Constitution by merely applying the Mass Gathering Law at all. This argument essentially repeats the Plaintiffs' argument that the County Defendants violated clearly established federal constitutional law merely by applying the Mass Gathering Law at all, and must fail for the reasons discussed in Part II.B.3, *supra*.

of tort is that "harm intentionally inflicted is prima facie actionable unless justified." *Id.* "Prima facie tort" serves as a catch-all cause of action in tort where no other suitable one exists; it may be pleaded in the alternative to other forms of tort, but if one is established, the prima facie tort claim "disappears." *Id.* There can be no cause of action for prima facie tort unless "disinterested malevolence" is the sole motive for a defendant's otherwise lawful act. *Schulz v. Washington County*, 550 N.Y.S.2d 446, 448 (App. Div. 1990).

Riverhead's only apparent objection to this claim is that the Plaintiffs cannot show that Riverhead "intentionally and maliciously sought to injure [them]," because "the employees of Riverhead went to great lengths in assisting Field Day in efforts to produce the [Festival]." While a trier of fact certainly may weigh this point against the Plaintiffs, it is an assertion that cannot be grounds for dismissal at the Rule 12(b)(6) stage, as the allegations in the Complaint support an inference that after *initially* assisting Field Day, Riverhead or its employees subsequently, and maliciously, decided to withdraw their support for the Festival. Again, dismissal cannot be based on conflicting factual contentions.

F.  *The Plaintiffs have sufficiently alleged that Riverhead owed them a "special duty" to prevent dismissal of their negligence claims.*

The Plaintiffs' Twelfth Cause of Action alleges negligence on the part of the Defendants. To state such a claim, a complaint must allege (1) the existence of a duty on the defendant's part as to the plaintiff; (2) a breach of that duty; and (3) resultant injury to the plaintiff. *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325,333 (1981). Riverhead attacks the Plaintiffs' negligence cause of action solely on the ground that Riverhead owed the Plaintiffs

no duty.    Specifically, states Riverhead, "all the claims against Riverhead stem from conduct related to the Agreement," but " '[i]t is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.' "    Riverhead Reply Memo at 6 (quoting *Clark-Fitzpatrick, Inc. v. Long Island R.R Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)).

   The above quotation from *Clark-Fitzpatrick* is accurate, but incomplete; the Court of Appeals went on to say that "[t]his legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although *it may be connected with and dependent upon the contract*." *Id.* at 194 (emphasis added).    In this case, the Plaintiffs *are* alleging a duty separate from, although "connected with" the License Agreement between Field Day and Riverhead:  the "special duty" that a municipality owes where it has "voluntarily assumed a duty, the proper exercise of which was justifiably relied upon by persons benefitted thereby." *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 261-62 (1983).    The Plaintiffs assert that when Riverhead signed the License Agreement, it assumed a special duty — separate and independent of its duties under the License Agreement itself — to act on Field Day's behalf, a duty that Field Day justifiably relied upon.

   Riverhead's only duty under the License Agreement was to provide "sufficient police protection" (however defined) at the Festival.    Further, as Riverhead itself noted earlier (in Part III.A, *supra*), the Licensing Agreement conditions Riverhead's obligation on Field Day's obtainment of a mass gathering permit, which never occurred.    Riverhead's contractual duty under the License Agreement was thus both strictly limited, and never even imposed.

-46-

Nevertheless, as Riverhead itself repeatedly stresses, "Riverhead, and its employees, provided extensive assistance and cooperation to Field Day in attempting to obtain additional security and the Permit." This assistance was clearly *not* an element of the License Agreement — the only contract at issue. The Complaint also supports a reasonable inference that Riverhead indicated that this assistance would continue, and would succeed in achieving the "necessary" preconditions for issuance of a Mass Gathering Permit.

In sum, the allegations in the Complaint support a colorable claim that Riverhead assumed a special duty to the Plaintiffs — a duty related to, but separate from, its potential duties under the Licensing Agreement; the Complaint also allows a reasonable inference that the Plaintiffs justifiably relied on the continuing "proper exercise" of this special duty. The Plaintiffs have thus demonstrated the "duty" element of their negligence claim, and Riverhead's argument for dismissing this cause of action fails.[12]

G. *There is no dispute that Plaintiff AEG has not asserted a contract claim against Riverhead.*

Riverhead states that "AEG is not a proper party in this suit against Riverhead," and "cannot make out a claim against Riverhead." But the only explanation provided in Riverhead's memorandum for this point indicates that this argument only refers to the Plaintiffs' breach of contract claim. Riverhead says: "AEG was not a party to the [License] Agreement and never had

---

[12] Perusal of the Complaint's Twelfth Cause of Action indicates that the Plaintiffs' claims sound largely in *intentional* tort, not negligence. But because Riverhead does not raise this issue or target any particular paragraphs in its memoranda, because there are sufficient suggestions of negligent acts interspersed among the allegations in this cause of action, and because a party may plead in the alternative, the Court will not further analyze this issue.

a relationship that would give rise to any claim against Riverhead. As a result, its breach of contract claim should be dismissed." In response to this point, the Plaintiffs state that AEG has not asserted any breach of contract claim, and "only Field Day is asserting such a claim, as only Field Day was a party to the License Agreement with Riverhead." And indeed, the relevant paragraphs in the Complaint regarding breach of contract refer only to "Field Day," and not to "Plaintiffs." *See* Complaint ¶¶ 129-135. As the Parties appear to agree on this point, no further decision is required.

## CONCLUSION

For all of the reasons above, the Defendants' motions to dismiss the complaint or all claims against them must be DENIED.

**SO ORDERED.**

Dated: Central Islip, New York
      September 30, 2005

                                           /s/_____
                                           Denis R. Hurley
                                         United States District Judge