UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
FIELD DAY, LLC, f/k/a/NEW YORK MUSIC
FESTIVAL, LLC, AEG LIVE LLC f/k/a
AEG CONCERTS LLC,

                        Plaintiffs,                           **MEMORANDUM & ORDER**

      -against-                                 Civil Action No. 04-2202

COUNTY OF SUFFOLK, SUFFOLK COUNTY
DEPARTMENT OF HEALTH SERVICES,
SUFFOLK COUNTY EXECUTIVE ROBERT
GAFFNEY, COMMISSIONER OF THE SUFFOLK
COUNTY DEPARTMENT OF HEALTH
SERVICES BRIAN L. HARPER, COMMISSIONER
OF SUFFOLK COUNTY POLICE DEPARTMENT
JOHN C. GALLAGHER, DIRECTOR OF SUFFOLK
COUNTY DEPARTMENT OF HEALTH SERVICES
ROBERT MAIMONI, CHIEF OF THE BUREAU OF
PUBLIC HEALTH PROTECTION BRUCE
WILLIAMSON, PRINCIPAL PUBLIC HEALTH
SANITARIAN ROBERT GERDTS, DEPUTY
SUFFOLK COUNTY ATTORNEY ROBERT
CABBLE, DEPUTY SUFFOLK COUNTY
EXECUTIVE JOE MICHAELS, SERGEANT
PATRICK MAHER OF THE SUFFOLK COUNTY
POLICE DEPARTMENT, THE TOWN OF
RIVERHEAD, RIVERHEAD CHIEF OF POLICE
DAVID HEGERMILLER and NEW YORK
STATE HEALTH COMMISSIONER ANTONIA
C. NOVELLO.

                        Defendants.
----------------------------------------------------------------X


**APPEARANCES:**

**O'Melveny & Myers LLP**
Attorneys for Plaintiffs
7 Times Square
New York, New York 10036
By:    Charles E. Bachman, Esq.
        Peter Obstler, Esq.
        B. Andrew Bednark, Esq.

**Christine Malafi, Suffolk County Attorney**
Attorneys for Suffolk County Defendants
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York
By:     Christopher A. Jeffreys, Esq.
        Susan A. Flynn, Esq.

**Smith, Finkelstein, Lundberg, Isler & Yakaboski, LLP**
Attorneys for Town of Riverhead
456 Griffing Avenue
P.O. Box 389
Riverhead, NY 11901
By:     Phil Siegel, Esq.

**Thomas C. Sledjeski & Associates, PLCC**
Attorneys for Riverhead Police Chief David Hegermiller
18 First Street
P.O. Box 479
Riverhead, New York 11901
By:     Thomas C. Sledjeski, Esq.


**HURLEY, Senior District Judge:**

Plaintiffs Field Day LLC f/k/a/ New York Music Festival and AEG Live LLC f/k/a/ AEG

Concerts LLC (collectively "plaintiffs" or "Field Day") commenced this action for money

damages and injunctive relief against the County of Suffolk and the Suffolk County Department

of Health Services (collectively the "County") and numerous County employees[1] (the County

---

[1] The Individual County Defendants are Suffolk County Executive Robert Gaffney ("Gaffney"), Commissioner of the Suffolk County Department of Health Services Brian L. Harper ("Harper"), Commissioner of the Suffolk County Police Department John C. Gallagher ("Gallagher"), Director of the Suffolk County Department of Health Services Robert Maimone ("Maimone"), Chief of the Bureau of Public Health Protection Bruce Williamson ("Williamson"), Principal Public Health Sanitarian Robert Gerdts ("Gerdts"), Deputy Suffolk County Attorney Robert Cabble ("Cabble"), Deputy Suffolk County Executive Joe Michaels ("Michaels"), and Sergeant Patrick Maher of the Suffolk County Police Department ("Maher"). Parenthetically, the Court notes that Robert Maimone's name is variously spelled as Maioni, Maimoni, and Maimone; the Court will use "Maimone" as it is the spelling used in his

2

employees named as defendants are collectively referred to as the "Individual County Defendants," and the Individual County Defendants and the County are collectively referred to as the "County Defendants"), the New York State Health Commissioner, the Town of Riverhead ("Riverhead") and the Riverhead Police Chief ("Hegermiller"). Plaintiffs allege that they were unlawfully denied the right to stage a weekend-long concert festival within the Town of Riverhead because of the actions of the various defendants. This opinion will address (1) Riverhead's motion for summary judgment; (2) Hegermiller's motion for summary judgment; and (3) plaintiffs' motion for partial summary judgment against Riverhead and Hegermiller. For the reasons set forth below, the relief sought in all three motions is denied, except that Riverhead's and Hegermiller's applications targeting plaintiffs' eleventh cause of action sounding in prima facie tort are granted, and that cause of action is dismissed as to those defendants as a matter of law.[2]

## Background

This action arises out of Field Day's efforts to promote and produce a two-day music festival featuring leading rap, hip-hop, and rock artists which was to take place June 7-8, 2003 (the "Festival"). After considering other locations, Field Day entered into a "License Agreement for Outdoor Event" (the "Agreement") with the Riverhead Community Development Agency

---

deposition.

[2] Plaintiffs' motion for partial summary judgment against the County and all the Individual County Defendants except Maher and Harper, and the County Defendants' motion for summary judgment are addressed in a separate Memorandum and Order also bearing today's date.

("CDA"), a "public instrumentality" of the Town of Riverhead.[3]   Under the terms of the License

Agreement, Field Day paid $150,000 to lease roughly 1,000 acres of the Calverton Enterprise

Park from May 5, 2003 to June 22, 2003 for the purposes of holding the festival.  Agreement ¶¶

1,3; Second Amended Complaint ¶ 35.  Field Day expected the festival to draw between 35,000

and 40,000 people.

Under the Agreement, Field Day had the responsibility of securing "a 'Mass Gathering

Permit' or such other assembly permit as is deemed necessary by the Commissioner of the

Suffolk County Department of Health" prior to the concert "and a 'Special Event Permit' from the

Town of Riverhead . . ." Agreement ¶ 2.  The CDA agreed to "provide sufficient police

protection (including necessary barriers and bike racks); and any necessary road signs for

purposes of directing highway and road traffic only."  Agreement ¶ 6.  The Agreement further

provides that Field Day "agrees that it shall also provide additional security services reasonably

necessary to protect the health and safety of concert goers as well as the general public attending

the Event, and generally to protect against damage to or loss of property, including the land,

buildings, equipment and/or facilities provided by CDA hereunder for use in connection with the

Event.   [Field Day] and CDA will undertake all necessary coordination with state, county and

local law enforcement agencies." Agreement ¶ 6.

Over the next several months, Field Day worked with Riverhead and Suffolk County in

order to obtain the mass gathering permit.  On May 27, 2003 the mass gathering permit was

denied.  On June 3, 2003 the County moved in New York State Supreme Court for an injunction

---

[3]  The Agreement is attached as Exhibit 1 to the Declaration of B. Andrew Bednark
("Bednark Decl.") submitted in support of plaintiffs' motion for partial summary judgment
against defendants Suffolk County and the Individual Suffolk County Defendants.

to preclude Field Day from holding the festival. The instant action was commenced on May 26, 2004.

Field Day alleges that Riverhead and Suffolk County, through their employees, unlawfully failed to approve its application by imposing a series of arbitrary prerequisites to the issuance of the permit. By way of two examples of such unconstitutional impediments, plaintiffs cite Riverhead Police Chief Hegermiller's position that approximately 200 police officers would be necessary to service the event, and Suffolk County's insistence that before it could provide officers towards that goal, an intermunicipal argument would have to be executed between Riverhead and the County. The Second Amended Complaint alleges violations of First Amendment free speech rights and common law claims including tortuous interference with contractual relations, tortuous interference with business relations, prima facie tort and negligence.

## Discussion

### I.    Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir. 2008); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986); *see SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See SCR Joint Venture*, 559 F.3d at 137; *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or more than "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County*

*of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)).[4] "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of a summary judgment motion." *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). In deciding a summary judgment motion, a

---

[4] The cited portion of Fed. R. Civ. P. 56(e) was renumbered as Rule 56(c)(4) as part of the amendments to Rule 56 effective December 1, 2010.

court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

## II.    Riverhead's Motion for Summary Judgment

Riverhead has moved for summary judgment as to all of Field Day's claims in which it is named as a defendant. Those various causes of action, as synopsized by the movant, allege that "Riverhead breached the Agreement by failing to provide sufficient police services for the concert, violated 42 U.S.C. § 1983, conspired to violate the plaintiffs' civil rights, violated Section 8 of the State Constitution, and engaged in tortious and negligent conduct." Def. Riverhead's Mem. in Supp. of Mot. for Summary J. at 1. Judgment, Riverhead proffers, "should be entered in [its] favor . . . because the evidence fails to support the plaintiffs' claims as a matter of law." *Id.* The targeted claims will be discussed in turn, beginning with the breach of contract cause of action.

### a) Breach of Contract

#### (i)    Parties to the Agreement are Field Day and the CDA; Legal Distinction Between Town of Riverhead and its CDA

The parties to the February 20, 2003 Agreement are the CDA and New York Music Festival LLC, which, as the caption to the Second Amended Complaint indicates, was a predecessor entity of Field Day. However, the CDA, unlike Riverhead, is not a named-defendant in the caption of the case nor mentioned in the "PARTIES" portion of the complaint. *See* Second Amendment Compl. "PARTIES" at 4-7.

Section 680-c, entitled "Town of Riverhead [C]ommunity [D]evelopment [A]gency," of

the New York State General Municipal Law, created the CDA as "a body corporate . . . [of] perpetual . . . duration" with "the powers and duties . . . conferred by Articles 15 and 15-a of this chapter upon community development agencies. . . ." N.Y. Gen. Mun. L. § 680-c.  "Its members shall consist of the supervisor of the [T]own of Riverhead, who shall be its chairman and the four councilmen of the [T]own of Riverhead." *Id.*  It is a separate and distinct entity that "has an existence independent of the sponsoring municipality" i.e. the Town of Riverhead.  N.Y. Op. State Compt. 78-402.  Among its powers as a community development agency is the power "to sue and be sued," N.Y. Gen. Mun. L. § 554(1), and "to make and execute contracts and all other instruments necessary or convenient for the exercise of its powers and functions."  N.Y. Gen. Mun. L. § 554(4).

Plaintiffs contracted with CDA, rather than the Town of Riverhead, presumably because the "CDA owns title in fee to approximately 2400 acres of land in Calverton, New York, commonly known as Calverton Enterprise Park," a portion of which was "[l]icensed" to plaintiffs for the festival.  Agreement at 1.  The Agreement signatory for the CDA is Robert F. Kozakiewicz, in his capacity as "Chairman" of the CDA.  *Id.* at 10.  To the left and below the signatures affixed on the Agreement's last page on behalf of the two contracting parties is the signature of "Escrow Agent" John J. Hansen ("Hansen"), who is identified as the "Financial Administrator of the Town of Riverhead." *Id.*  Paragraph 5 of the Agreement explains that the licensee shall post $10,000 in escrow [with Hansen] to assure that the grounds are appropriately "cleaned and restored" after the festival to the satisfaction of the CDA.  *Id.* ¶ 5.  And paragraph 7 requires the licensee to list the Town of Riverhead along with the CDA as potential beneficiaries as their interest may appear in the "Insurance and Indemnification" portion of the Agreement.  *Id.*

at ¶ 7.  However, those two incidental provisions, viz. identifying Hansen as the escrow agent and including Riverhead with the CDA in the insurance and indemnification provision of the Agreement,[5] do not affect that which is obvious from a perusal of the Agreement, viz. Riverhead is not a party to the Agreement.

The CDA, as mentioned previously, is a "body corporate . . . perpetual in duration," N.Y. Gen. Mun. L. § 680-c, separate and distinct from Riverhead.  *See* N.Y. Op. State Compt. 78-402. "Town Law § 64(6) demands that a formal resolution be passed by the Town Board and executed by the Town Supervisor in the name of the Town before a Town can be bound by any contract."[6] *Verifacts Grp., Inc. v. Town of Babylon*, 267 A.D. 2d 379, 379 (2d Dep't 1999); *see also Granada Bldgs., Inc.v. City of Kingston*, 58 N.Y.2d 705, 708, 444 N.E.2d 1325, 1326 (1982). That CDA members, "consist[s]  of the supervisor of the town of Riverhead . . . and the four council [persons] of the town of Riverhead," N.Y. Gen. Mun. L. § 680-c, does not erode the need for strict compliance with Town Law § 64 if the Town is to be bound by a contract.  *See* 1970 NY Atty Gen. Rep. & Op. 114-15 (1970)(N.Y. Gen. Mun. L. § 507(2)(d) requires that Rochester's Common Council, as the City's "governing body," must approve by at least a majority vote any proposed disposition of real property owned by its Urban Renewal Agency, even though the same individuals sit on both the Common Council and its Urban Renewal

---

[5]  The inclusion of Town of Riverhead with the CDA in the Agreement's insurance and indemnification provision is understandable since Riverhead police officers would have been on duty at the festival had it been held.

[6] Town Law § 64(6), entitled "Award and execution or town contracts," provides that the town board "[m]ay award contracts for any purpose authorized by law and the same shall be executed by the supervisor in the name of the town after approval by the town board."

Agency pursuant to N.Y. Gen. Mun. L. § 581).[7]

In sum, the parties to the Agreement are plaintiffs and the Riverhead CDA. The latter

entity is not a party to Field Day's lawsuit. Plaintiffs may not look to the Town of Riverhead to

answer for the purported breach by the CDA unless the Town is estopped from arguing the

distinction between it and its CDA, or the Town adopted, i.e. ratified the Agreement. Those two

subjects, viz. estoppel and ratification, will be discussed next.

### ii) May Riverhead be Held Liable Under the Agreement via Estoppel or Ratification?

Plaintiffs portray its failure to include the CDA among the entities and individuals sued as

a non-event. In response to Riverhead's effort to draw a critical line of demarcation between the

Town and the Town's CDA, plaintiffs observe that the Court has already found that "Field Day

entered into a 'License Agreement for [the] Outdoor Event' with the Riverhead Community

Development Agency (CDA), which the Parties do not dispute is a public instrumentality of the

Town of Riverhead," Pls.' Mem. in Opp'n to Riverhead's Mot. (quoting from this Court's

September 30, 2005 Memorandum and Order (Docket # 76) at 5-6 )(emphasis in original).

Additionally, plaintiffs note that Riverhead, prior to the present cross-motions for summary

judgment, has consistently "treat[ed] the entities as one and the same [prior to, and during the

---

[7] GML § 581, entitled "Rochester urban renewal agency," provides in pertinent part that the City's Urban Renewal Agency "shall constitute a body corporate politic . . . and consist of the nine councilmen of the city of Rochester, including the mayor who shall be chairman."

Even though the Attorney General's opinion is not controlling authority, I find it to be persuasive as being both consistent with a literal, common sense reading of GML § 507(2)(d), and with related case law underscoring that municipalities may not be contractually bound absent strict adherence with relevant statutory provisions. *See, e.g., Granada*, 58 N.Y.2d at 708 and *RB Hempstead, LLC v. Incorporated Vill. of Hempstead*, 34 A.D.3d 552, 553 (2d Dep't 2006).

present litigation]."  (Pls.' Opp. Mem. at 7.)  Accordingly, plaintiffs posit, "Riverhead cannot now hide behind the CDA's purportedly limited authority," *id.*, or presumably, its belated assertion that the two entities are separate and distinct.

Moreover, the argument continues, even if, arguendo, "Riverhead and the CDA were separate for the purposes of the License Agreement . . .  by representing that Riverhead was entering the contract and committing to provide police . . . , Riverhead is equitably estopped from arguing that its obligations are limited to the CDA's purportedly narrow powers.  "Pls.' Mem. in Opp'n to Riverhead's Mot. at 7 (citing *Benincasa v. Garrubbo*, 141 A.D.2d 636, 638 (2d Dep't 1988)).

Considering these arguments sequentially as presented by plaintiffs, the Court's observation, in denying defendants' Rule 12(b)(6) motion, that "the Parties do not dispute [that the CDA] is a public instrumentality of the Town of Riverhead" is just that, an observation, not a conclusion meant to override the CDA's statutory status as a separate entity.

Similarly unavailing is plaintiffs' argument that Riverhead is equitably estopped from relying on the fact that the licensor under the subject contract is the CDA, not Riverhead, even though there is considerable evidence in the record that the then Town Supervisor (*see, e.g.*, Exs. E-H, Attached to Bednark Decl. in Supp. of Pls.' Mot. for Partial Summ. J. against Riverhead and Hegermiller), as well as counsel for the Town, have incorrectly characterized the Agreement after the fact as being between Field Day and the Town of Riverhead.  Were this a contract between private parties, such statements – assuming arguendo the presence of the other required estoppel elements (*see Benincasa*, 141 A.D.2d at 638) – might give rise to a viable claim of estoppel. However, Riverhead is a public, not a private entity.  As such, the ability of its officers and

agents to saddle it with contractual obligations is statutorily circumscribed.  *Genesco Entm't v.*

*Koch*, 593 F. Supp. 743, 747-48 (S.D.N.Y. 1984)("Unlike individuals and private corporations, .

. . a municipality's power to contract is statutorily restricted for the benefit of the public.").

As noted earlier, Town Law § 64 provides in pertinent part: "Subject to the law of this

chapter, the town board of every town . . . . (6) [m]ay award contracts for any of the purposes

authorized by law and the same shall be executed by the supervisor in the name of the town after

approval by the town board."  And included within § 63 of the same law is the directive that

"[e]very act , motion or resolution shall require for its adoption the affirmative vote of a majority

of all members of the town board."  As explained in *Goldberg v. Penny*, 163 A.D.2d 352, 353

(2d Dep't 1990), "[i]t is fundamental that a municipality can only contract for an authorized

purpose and then only in a manner provided by statute."  Indeed, "a party dealing with a

municipality is chargeable with knowledge of the statutes which regulate its powers and is bound

by them."  *B.T.  Skating Corp. v. County of Nassau*, 204 A.D.2d 586, 586-587 (2d Dep't 1994).

"Thus, it is solely at his peril that such a party presumes that the persons with whom he is dealing

are acting within the scope of their authority and, since the extent of that authority is a matter of

public record, there is a conclusive presumption that he is aware of it."  *Walentas v. New York*

*City Dept. of Ports*, 167 A.D.2d 211, 212 (1st Dep't 1990).  From the foregoing, it follows that,

"because a governmental subdivision cannot be answerable for the unauthorized acts of its

agents, we have frequently reiterated that estoppel is unavailable against a public agency."

*Granada*, 58 N.Y.2d at 708 (internal citations deleted); s*ee also Morely v. Arricale*, 66 N.Y.2d

665, 486 N.E.2d 824 (1985) and  *Bloomberg-Dubin v. Bd. of Educ. of New York*, 82 A.D.2d 854,

856 (2d Dep't 1981), *aff'd*, 56 N.Y.2d 555 (1982).

Simply put, plaintiffs' estoppel argument lacks merit as a matter of law. Attention will now be directed to issue of ratification.

Although Riverhead's CDA (again, a non-party to this action), rather than the Town itself, is the licensor under the Agreement, the Town could assume the CDA's contractual obligations via ratification. The parties dispute whether the Town did so by purportedly agreeing to provide police services for the festival. However, neither side has provided specific authority concerning the ratification mechanism necessary to accomplish that result. It seems clear, however, that the same procedure, to wit, an affirmative vote by the Town Board consistent with Town Law §§ 63 and 64(6), would be necessary to bind the Town to the Agreement after its signing as would have been necessary had it been one of the original contracting parties. *See, e.g., Seif v. City of Long Beach*, 286 N.Y. 382, 388, 36 N.E. 2d 630, 632 (1941) (New York Court of Appeals rejected as unsound the trial court's jury instruction "that [the] failure by the Council to object to the continued performance by [plaintiff of services for the City] under an unauthorized contract . . . would be sufficient to constitute ratification of such unauthorized contract if the jury finds that four of the five members of the [City] Council had knowledge of the unauthorized retainer [and failed to complain]"; that instruction was flawed, as explained by New York's highest court, given the absence of a resolution passed by the Council ratifying the retainer as required by the City Charter), and *Modern Amusements, Inc. v. Marriot Corp.*, 599 F. Supp. 1548, 1550-53 (S.D.N.Y. 1985).

In any event, defendant maintains that the "Town Board of the Town of Riverhead never adopted a resolution ratifying the Agreement or the use of Riverhead police services for the concert." Def. Riverhead's Mem. in Supp. at 9; *see also* Aff. of then Town Attorney Dawn C.

Thomas, ¶ 24, attached to Affirm. of Phil Siegel Submitted in Opp'n to Pls.' Mot. for Summ. J. ("To the best of my knowledge, the Town Board . . . never adopted a resolution ratifying the Agreement or approving the use of Riverhead's Police Department for the event.")[8]

Plaintiffs' label the Town's representation as "wrong as a matter of fact," citing Exhibits QQQQ and RRRR to the Bednark Declaration submitted in Opposition to Riverhead's Motion. In Exhibit QQQQ, the then Town Supervisor said at a Town Board or other type of public meeting that "we[9] have signed agreements which are license agreements with both promoters," and in Exhibit RRRR, the same individual is reported to have stated in a like venue that the "Town Board has approved . . . license agreements for these events," referring to the festival. Those statements may be accurate factual statements evidencing the Town Board's ratification of the CDA's contract, or merely imprecise colloquial comments consistent with some of the other inaccurate or ambiguous utterances made by representatives of the Town during the immediate post-contract period to date. That lack of clarity precludes the Court from resolving the ratification issue in plaintiffs' favor at this stage of the proceedings. Similarly, given that Riverhead's position about the absence of an adopting resolution is premised on a statement by its then Town Attorney which, unless buttressed by a different or more expansive foundation would be inadmissible at trial, the Court is not in a position on the current record to grant Riverhead's summary judgment motion as to Field Day's breach of contract claim.

---

[8] Unfortunately, the basis for Ms. Thomas's knowledge is not provided, such as, e.g., a perusal of the Town Board minutes during the relevant time frame.

[9] Whether the "we" refers to the Town Board or the CDA is not discernable from the exhibit cited.

### iii) CDA's Authority to Commit the Town's Police Department
      Personnel and Resources to the Event

In addition to contending that the Town is not liable to Field Day because it was not a party to, or ever adopted a resolution ratifying, the Agreement, Riverhead advances a variation of that argument with respect to the CDA's claimed contractual responsibility to provide police coverage for the event. Given that the CDA has not been sued, the issue is academic. Nonetheless, given, inter alia, the attention devoted to the issue by counsel, it will be addressed.

Defendant maintains that the CDA lacked "state law . . . authority . . . to commit the use of police resources" and, to the extent it may have endeavored to do so, such efforts were *ultra vires* and unenforceable. Def. Riverhead's Mem. in Supp. at 7 (all letters in upper case in original).

Field Day responds thusly:

> [T]he CDA does not, as Riverhead now claims, lack the authority to commit Riverhead police. In fact, the CDA has the express statutory power "with the consent of the municipality to use agents, employees, and facilities of the municipality." N.Y. Gen. Mun. Law § 554(8). And Riverhead has the express statutory power to "cause administrative, *police*, sanitation, fire protection or other municipal services to be furnished to the [CDA]." N.Y. Gen. Mun. Law § 503-a(4)(f)(emphasis added). That consent and power was invoked here when the Riverhead Town Supervisor instructed the Town's Police Chief to deploy police for the Festival. Moreover, even if the Town Supervisor had not issued such an instruction, the CDA's very execution of the License Agreement constituted Riverhead's implied consent because the same officials control both the CDA and the Town. *See* N.Y. Gen. Mun. Law § 680-c ("[The CDA's] members shall consist of the supervisor of the town of Riverhead, who shall be its chairman, and the four councilmen of the town of Riverhead."

Pls.' Mem. in Opp'n to Riverhead's Mot. at 7-8 (internal citations to the record deleted).

Proceeding in reverse order, plaintiffs' "implied consent" argument is off-target. Only in

extraordinary circumstances, have New York courts permitted recovery against a municipality under an implied authority theory. One such example of this rare breed of cases is *Cahn v. Town of Huntington*, 29 N.Y.2d 451, 278 N.E.2d 908 (1972). There, the Town Board, utilizing the Town Attorney, sued the Town Planning Board. The Planning Board in turn retained counsel to defend the suit, but the Town Board declined to pay that attorney's bills. Given that unusual scenario, the New York Court of Appeals, by a 5 to 2 margin, held that the Planning Board's counsel was entitled to payment under an implied authority theory, cautioning, however, that "[i]t should be abundantly clear that in view of the stringent requirements that must be satisfied, the policy underlying the general rule of [requiring] express authority is certainly not compromised by this exception." *Id.* at 455. In contrast to *Cahn*, the present dispute, devoid of any overriding extraordinary circumstances, falls squarely within the general rule referenced by the Court of Appeals, thereby precluding recovery under an implied authority theory. *See, e.g.*, *Kelly v. Cohoes Hous. Auth.*, 27 A.D.2d 463, 465 (3d Dep't 1967); *Lutzken v. City of Rochester*, 7 A.D.2d 498, 499 (4th Dep't 1959)("The doctrine of implied contract cannot be invoked to do rough justice and fasten liability [on a municipality] where the legal requirements specifically prohibit"); *see also Seif*, 286 N.Y. 382.

Plaintiffs' reliance on N.Y. Gen. Mun. L. § 554(8) is puzzling. That subsection simply provides that an agency, such as the CDA, is authorized "with the consent of the municipality[,] to use agents, employees, and facilities of the municipalities, paying to the municipality its agreed proportion of the compensation and costs." N.Y. Gen. Mun. L. § 554(8). Although that provision is straightforward, plaintiffs seemingly do not contend Riverhead, acting through the Town Board pursuant to Town Law §§ 63 and 64(6), consented to the CDA's use of the police

department for the concert, no less entered into a cost-sharing agreement with the CDA for that purpose. Instead, the Town Supervisor is said to have furnished the requisite municipal consent by "instruct[ing] the Town's Police Chief to deploy police for the Festival." Pls.' Mem. in Opp'n to Riverhead's Mot. for Summ. J. at 8. Tellingly, that statement by plaintiffs is unaccompanied by any authority suggesting that Town Law §§ 63 and 64(6) are inapplicable, and that the Supervisor, acting alone, had the authority to commit the police resources called for under the Agreement.

In sum, the CDA is not a defendant. Therefore, its compliance or non-compliance with the terms of the Agreement is not germane for present purposes. Nonetheless, if the CDA was a party to the present litigation, its commitment, if that's what it was, to furnish the necessary police resources for the festival would appear to be unenforceable as *ultra vires*. *See Lindlots Realty Corp. v. Suffolk Co.*, 278 N.Y. 45, 52-53, 15 N.E.2d 393, 395 (1938)("It is undisputed that a municipality cannot be held liable for breach of contract . . . when an official of the municipality has exceeded his power or authority"); *see also RB Hempstead*, 34 A.D.3d at 553 (the Village's CDA's contract to sell a parcel of property was unenforceable in that the subject property was owned by the Village of Hempstead, not its CDA, and the "Village's Board of Trustees [never] provided explicit approval for the sale.").

### iiii) Other Grounds Urged by Riverhead in Seeking Summary Judgment on Plaintiffs' Breach of Contract Claim Against the Town

As noted earlier, given that Riverhead has not rebutted the evidence cited by Field Day, tangential as it may be, indicating that Riverhead adopted the CDA's contractual obligations under the Agreement, the Town has failed to establish that it is entitled to summary judgment

based on its non-ratification argument.  As a result, the Court will now address the alternative grounds urged by the Town in seeking summary judgment on this claim, viz. (1) Field Day cannot prevail because it failed to fulfill an express condition of the agreement when the County denied its application for a mass gathering permit; (2) Field Day cannot prevail because performance was rendered impossible when the County obtained a Court Order cancelling the concert; and (3) Field Day elected to continue with the agreement after learning that Riverhead would not provide a sufficient number of police for the concert.  As to each of these arguments, there are factual issues which preclude summary judgment.

With respect to grounds (1) and (2), there is evidence in the record from which a jury could conclude that Riverhead's actions caused Field Day's failure to obtain a mass gathering permit and caused the County to seek a temporary restraining order.  For example, there is evidence from which a jury could find that Riverhead, acting through Police Chief Hegermiller – a policy maker for purposes of plaintiffs' federal claims, and as a Town employee as to the state-based charges – intentionally set the requirement of approximately 200 police officers at an inflated level in the hope of derailing the festival,[10] and that his May 23, 2003 letter to Gerdts of the Suffolk County Department of Health Services indicating that he was no longer "able to support [the] issuance of the Mass Gathering Permit," Bednark Decl. in Supp. of Pls.' Mot. for Partial Summ. J. against Riverhead and Hegermiller, Ex. PP, were each a proximate cause of the permit's denial on May 27, 2003.  *See, e.g.*, *id*., Exs. QQ, RR, and SS.  And the denial of the permit was the trigger – or so a jury could conclude – that caused the County to seek and obtain a

---

[10]   The significance of Hegermiller indicating that approximately 200 police officers would be necessary for the concert is discussed in the text *infra* under the caption "Hegermiller's Motion for Summary Judgment."

temporary restraining order prohibiting the concert from being held. Under the circumstances, Riverhead's argument that Field Day's inability to obtain a mass gathering permit from the County and the County's obtaining of a temporary restraining order necessarily excused the Town's purported failure to "provide sufficient police protection" as required under paragraph 6 of the Agreement is problematic. *Benincasa*, 141 A.D.2d at 638 ("[A] party to a contract cannot insist upon the fulfilment of a condition when he has been the cause of its nonperformance.").

Riverhead's third argument, to wit, that it is entitled to summary judgment as Field Day elected to proceed with the project after learning that Riverhead would not provide a sufficient number of police officers, is similarly unavailing given the existence of factual issues. For example, there is evidence that, although unable to supply sufficient police from its own department, Riverhead sought to locate additional police personnel from other entities, such as the County and neighboring municipalities (*see, e.g.*, Bednark Decl. in Opp'n to Hegermiller's Mot. for Summ. J., Exs. AAAA, BBBB), all of which was known to Field Day given its attendance at various Riverhead meetings regarding police staffing for the festival. Also there is information in the record that Field Day was willing to hire off-duty officers to close any gap between the number of officers Riverhead could supply and the number estimated to be needed by Hegermiller. Thus a trier of fact could conclude that Field Day appropriately moved forward with its plans for the scheduled event.

### (b) Riverhead's Summary Judgment Motion as to Plaintiffs' Remaining Claims

For the reasons discussed *infra* under the heading "Hegermiller's Motion for Summary Judgment," Riverhead's motion for summary judgment is granted as to plaintiffs' prima facie tort

claim.  However, as to each of the other remaining causes of action asserted against Riverhead, Riverhead has failed to establish that it is entitled to summary judgment.  Instead, based on the submissions of the parties including their cites to the voluminous record (*see* Riverhead's Mem. in Supp. at 11-13 and its Reply Mem. at 8-10, as well as Pls.' Mem. in Opp'n at 11-18), it appears that there are unresolved material issues of fact as to such claims consistent with the position urged by plaintiffs.

### III.  Hegermiller's Motion for Summary Judgment

#### a) Summary Judgment Motion Based on Qualified Immunity

Hegermiller moves for summary judgment on, inter alia,  the constitutional claims asserted against him on the grounds of qualified immunity.  "Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits."  *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995).  A court may grant summary judgment on qualified immunity grounds "if [the movant] adduces sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the [movant] to believe that he was acting in a fashion that did not clearly violate an established federally protected right."  *Hartline v. Gallo,* 546 F.3d 95, 102 (2d Cir. 2008) (internal quotations omitted).

To place plaintiffs' claims against Hegermiller, and Hegermiller's motion for summary judgment based on qualified immunity in context, it is helpful to begin by revisiting the Agreement, particularly its paragraphs 4 and 6.  (The Agreement, as noted earlier, is attached as

Ex. 1 to Bednark Decl. in Supp. of Pls.' Mot. for Partial Summ. J. against the County and individual County Defs.). Paragraph 4, entitled "Responsibilities of Licensee," provides in pertinent part: "Licensee will be responsible for carrying out and shall have exclusive control of all operations associated with the Event and related activities, including . . . security for the Event (other than officials of the town Police Department which shall be arranged and provided by the CDA)." Paragraph 6, entitled "Responsibilities and Obligations of CDA," states, inter alia, that the "CDA acknowledges and agrees it shall provide sufficient police protection (including necessary barriers and bike racks); and any necessary road signs for purposes of directing highway and road traffic only." *Id.* ¶ 6. The line of demarcation between the licensee's responsibility to provide "security for the Event" and the CDA's obligation to "provide sufficient police protection" is not delineated. In any event, Field Day hired Concert Services to provide security for the event (Bednark Decl. in Supp. of Pls.' Mot. for Partial Summ. J. against Riverhead and Hegermiller. Ex. WW at 133:16 to 134:3), which outfit developed a plan calling for the deployment of somewhere between two and three hundred security guards on-site, *id.*, Ex. I at 83:10-21 and 111:2-115:4. It also warrants mention that the Agreement is devoid of any indication that the CDA intended to look beyond Riverhead's borders to fulfill its obligation to complement the security personnel to be provided by Field Day. Indeed, the Agreement's sole reference to other police departments is found in paragraph 6 which simply provides that the "Licensee and CDA will undertake all necessary coordination with state, county and local law enforcement agencies."

Hegermiller's input was not sought before the Agreement was signed by the contracting parties. *Id.*, Ex. M at 13:10-16. After learning of the event and the police department's

responsibilities with respect thereto, he voiced his displeasure to various Suffolk County officials at a meeting about the event. *Id.*, Ex. Q at 257:19-259:3. He also wrote a memorandum to the Town's Supervisor on April 10, 2003 with copies to the other town board members, detailing a number of reasons he was "not in favor of having Riverhead host [the Field Day] event." *Id.*, Ex. S. Among the reasons were the number of expected attendees, anticipated traffic and drug use problems, as well as the spectre of terrorism coupled with the "impossib[ility of] evacuat[ing] the site quickly." *Id.* In the Chief's view, the "time needed to plan for a successful event would be at least 10-12 months out" rather than the few months lead-time provided to him and the Department. *Id.* He concludes his memorandum with the caveat "that [he] will not be held responsible for something we did not have enough time to plan for." *Id.* The day after he wrote the memorandum, he wrote to the Suffolk County Police Commissioner indicating that "[p]reliminary estimates for police personnel are around 200 of which [the Town] could possibly supply 50," coupled with the request that the Suffolk County Police Department assist in filling the shortfall. *Id.*, Ex. U. And five days after that, i.e. on April 16, 2003, Hegermiller is reported to have stated to Captain Williams of the New York State Police, upon learning the State Police "would only be able to provide minimal manpower for the event[,] . . . that it was his hope that the State Police withdrawal would lead to the ma[ss] gathering permit being denied and the concert being cancelled." *Id.*, Ex. W.

Moreover, Hegermiller's estimate is not readily reconcilable with the lesser number of police officers utilized to monitor other large gatherings in Riverhead. By way of one example, consider the 2003 New York Air Show which was held from September 19th to the 21st in 2003, with an estimated attendance of around 50,000 per day. *Id.*, Ex. U. That per diem number is

approximately 10,000 to 15,000 more than the corresponding figure for the festival. Yet, the Air Show went forward with only Town Police[11] and no more than ten state troopers to service the event. *Id.*, Ex. Z, at 58:18-60:22. Of course, the Air Show presumably did not entail, unlike Field Day's scheduled concert, the likelihood of some overnight patrons and the accompanying need to oversee their activities. Conversely, however, the Air Show sponsors apparently, unlike Field Day, did not furnish hundreds of private security guards to assist with crowd control and like endeavors.

Plaintiffs correctly note that there is evidence in the record that would permit a trier of fact to conclude (1) that Hegermiller's estimate as to the needed number of police officers was a critical factor leading to the event not being held, and (2) that he arbitrarily selected that number, having had no prior experience with a sufficiently comparable event to provide meaningful guidance. *Id.*, Ex. M at 15:6-21; 45:14-17. To the extent Hegermiller's source for that figure was New York State Trooper David Candelaria (*id.*, Ex. X at 31:5-18; 34:8 to 35:5), an argument could be legitimately advanced that Hegermiller's reliance was unreasonable given Candelaria's lack of knowledge about the specific venue designated for the event and his, Hegermiller's, apparent failure to inquire of Candelaria about his general experience in such matters. Indeed, Candelaria testified at deposition that "200 . . . [was] a pretty good estimate [based] on [his] experience [although he] chose that number without looking at the venue and seeing what was

---

[11] Hegermiller testified that the Town Police force numbered "in the seventies" at the time and that the Town's law enforcement needs had to be provided for simultaneously. *Id.*, Ex. Z at 58:18-59:20. Based on Hegermiller's previously cited April 2003 letter to the Suffolk County Police Commissioner indicating that Riverhead could supply about 50 of the 200 police officers he estimated would be needed for the Field Day concert, the Riverhead Town police contingent on hand for the September 2003 Air Show probably was in the neighborhood of 50 officers.

24

actually needed." *Id.*, Ex. R at 53:14-17.

Having considered some of the evidence elicited during discovery pertaining to Hegermiller, attention will now be focused on the legal aspects of his motion for summary judgment based on qualified immunity. Of course, as he notes in his moving papers, the issue of qualified immunity does not arise unless there is a constitutional violation in the first instance, or more accurately stated in the present procedural context, unless there is evidence which would support a finding that Hegermiller violated plaintiffs' First Amendment right to stage the event. As to that threshold question, such evidence exists.

It may well be, as Hegermiller contends, that his estimate was furnished in a good faith effort to satisfy his responsibilities as police chief. There is no direct evidence to my knowledge to suggest otherwise. Moreover, even if the estimate is determined to have been negligently derived, such a finding would not constitute a constitutional violation on his part. Nonetheless, there is evidence which would permit a trier of fact – construing the evidence in favor of plaintiffs as the non-movants – to circumstantially conclude that Hegermiller deliberately inflated his estimate to derail the project, including:

(1) his opposition (which a trier of fact might label as "vehement") to Riverhead hosting the event, as detailed in his April 11, 2003 Memorandum to members of the Town Board;

(2) his apparent unwillingness to adjust his estimate based on the two hundred to three hundred private security personnel that Field Day had already lined up for the festival, or, if he felt that approximately 200 police officers were actually needed in addition to the security detail provided by Field Day, to suggest that Field Day increase its private security force;

25

(3) his statement to Captain Williams of the New York State Police that he hoped that the State's decision to only provide "minimal manpower" for the festival would result in the County denying the needed mass gathering permit to Field Day (*id.*, Ex. W);

(4) his seeming inability at deposition to articulate a sound rationale for his estimate; and

(5) his *sua sponte* decision (in the sense of apparently not being authorized by the CDA or the Riverhead Town Board) to send a letter to the person in the County considering Field Day's application for a mass gathering permit, notifying that individual that he "will not be able to support [the] issuance" of the needed permit in view of the County's decision not to provide police personnel. *Id.*, Ex. PP (May 23, 2003 Letter from Hegermiller to Robert Gerdts of the Suffolk County Dep't of Health Services).[12]

---

[12] Plaintiffs maintain that Hegermiller's mind-set in establishing the 200 officer estimate is further evidenced by his, and the Town's decision not to "enforce[] Riverhead's rights under Section 209-m of New York's General Municipal Law to *compel* the Suffolk County Police Department to provide the necessary additional police." (Pls.' Mem. in Supp. of Mot. for Partial Summ. J. against Riverhead and Hegermiller at 2 (emphasis added)). In support of that position, plaintiffs argue that the language in N.Y. Gen. Mun. L. § 209-m "authoriz[ing]" a local government to provide police assistance to another local government must be read as mandatory, citing *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 182-83 (2d Cir. 2006).

Plaintiffs' reliance on the Second Circuit's decision is misplaced, however. First, that decision involved New York's Mass Gathering Law and Sanitory Code, not GML § 209-m. The Circuit held that the Statute's and Code's use of the term "authorize" required the granting of a mass gathering permit to an applicant who had satisfied all of the permit requirements given "New York law [McKinney's Statutes § 171] generally provides that 'mandatory words may be interpreted in a merely permissive sense or vice versa'" . . . . and given the court's duty to "construe statutes, when necessary and possible, to avoid serious constitutional issues." 463 F.3d at 182. As noted by the Circuit "[w]ere the Mass Gathering Law and Sanitary Code read to 'authorize' an official to deny a mass gathering permit even where all statutory and regulatory requirements had been met and no unreasonable danger to life or health was present, the statutory/regulatory scheme would be of more than doubtful constitutional validity." *Id.* at 182-83. And secondly, to interpret § 209-m as mandating a local government receiving a request for assistance to assign "part of [its] forces, equipment and supplies of [its] police department" to the requesting entity could lead to absurd results. For instance, in the event of a calamity

To partially reiterate as to Hegermiller's motion for summary judgment on the ground of qualified immunity, there is evidence in the record which would support a finding that Hegermiller violated Field Day's constitutional rights. And if, arguendo, he set his 200 police officer estimate at an elevated level for the purpose of dooming plaintiffs' effort to hold the festival, it would be objectively unreasonable for him to believe that his activities did not run afoul of plaintiffs' rights under the First Amendment. Which is to say, there are issues of fact that must be determined before Hegermiller's claim of qualified immunity may be determined. (*See, e.g.*, *Weyant v. Okst*, 101 F.3d 845, 857-58 (2d Cir. 1996), *Weaver v. Brenner*, 40 F.3d 527, 533, 537 (2d Cir. 1994), and *Oliveira v. Mayer*, 23 F.3d 642, 648-50))). Therefore, Hegermiller's motion for summary judgment based on qualified immunity is denied.

### b) Hegermiller's Motion for Summary Judgment as to Plaintiffs' Other Claims

Hegermiller's motion for summary judgment on the claims for tortious interference with contractual relations, tortious interference with business relations, and for negligence are denied given the existence of material issues of fact. However, as to the cause of action sounding in prima facie tort, Hegermiller is entitled to summary judgment.

A cause of action for a prima facie tort requires a showing of "(1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful." *Curiano v. Suozzi*, 63 N.Y.2d 113, 117, 469 N.E.2d

---

simultaneously affecting multiple local governments, the spectre arises of cross-local government § 209-m requests being issued which, under plaintiffs' proffered interpretation, would compel compliance by all municipal recipients, leading to a chaotic reshuffling of the available regional police resources among neighboring communities without any net gain to the impacted area. Surely that type of potential scenario is out-of-sync with the statute's purpose. A common sense reading calls for a § 209-m "request" to be viewed as simply that, viz. a request, which may, or may not be honored by the local government receiving the request.

1324, 1327 (1984). "There can be no cause of action for prima facie tort unless malevolence is the sole motive for a defendant's otherwise lawful act." *Schulz v. Washington County*, 157 A.D. 2d 948, 950 (3d Dep't 1990)(internal quotation marks and cite deleted). "When the intent [of the actor] is mixed, so that other motives are present for defendants' actions, such as profit or self-interest, the mixture of motives bars recovery." *Stanley v. Amalithone Realty, Inc.,* 921 N.Y.S.2d 491, 501 (N.Y.Sup.,2011). As noted by New York Court of Appeals in *Burns Jackson Miller Summit & Spitzer v. Lindner* ("*Burns Jackson*"), "the genesis which will make a lawful act unlawful must be a malicious one unmixed with any other and exclusively directed to injury and damage of another." 59 N.Y.2d 314, 333, 451 N.E.2d 459 (1983).

The failure to establish any of the four prima facie tort elements is fatal to the claim. Focusing on the intent element, the record is bereft of any evidence to suggest that Hegermiller's intent in opposing the Field Day concert was maliciousness harbored against plaintiffs or their principals, no less evidence that such a mind-set was the sole motivator for his actions. Perhaps in recognition of that fact, plaintiffs contend that Hegermiller "acted maliciously toward the Festival," implicitly arguing that the goal of a contract, as distinct from a party to the contract, may constitute, "another" for purposes of the just given quote from *Burns Jackson*. No authority is provided for that expansive view of the permissible targets for a prima facie tort claim, I suspect because no such authority exists. But even if the festival could legitimately be considered the target, the evidence adduced during discovery, viewed most favorably to plaintiffs, indicates that Hegermiller's misgivings about the concert were attributable, at least in part, to his belief that, in essence, it represented a potential disaster for the Town. Which is to say, no view of the evidence would justify the conclusion that his sole motivation was maliciousness towards the festival per se.

In sum, Hegermiller's motion for summary judgment is granted as to plaintiffs' prima facie tort claim but is otherwise denied.

## IV. Plaintiffs' Motion for Summary Judgment

Plaintiffs move for partial summary judgment as against Riverhead and Hegermiller on their Section 1983 and state law claims. They also move for summary judgment on the breach of contract claim as against Riverhead. The factual issues which precluded summary judgment in favor of Riverhead and Hegermiller and against plaintiffs similarly preclude plaintiffs' motion for summary judgment in their favor against Riverhead and Hegermiller.

For example, just as there is evidence in the record that could permit a trier of fact to conclude that Hegermiller's requirement of approximately 200 officers was arbitrarily excessive, there is evidence from which one could find that the number was reasonable and set in good faith. For example, there is testimony that Hegermiller made that determination after consulting with New York State Police Trooper David Candeleria who at the time was "the emergency management sergeant for Long Island" with the responsibility for dealing with "numerous large scale events . . . ." Thomas C. Sledjeski's Decl. Submitted on behalf of Hegermiller in Opp'n to Pls.' Mot. for Summ. J., Ex. D ("Candelerai Dep."), at 8. Further, then Suffolk County Police Commissioner John Gallagher estimated that between 150 and 170 police officers would be needed for the event, an estimate arguably not that far removed from Hegermiller's figure. Gallagher June 6, 2003 Aff. at ¶ 5, Ex. H. The number of officers required for some other high attendance events would also permit an inference that 200 for the festival was not unreasonable. *See, e.g.,* Candalaria Dep. at 20:10-21:11 (150 troopers for one day "Greek Festival"); *id.* at 23:6-23 (30 to 50 officers for Long Island Marathon, a four-hour event); *id.* at 38:10-39:20 (90 state police officers plus unknown amount of park police for Jones Beach fireworks).

Field Day's motion for partial summary judgment against Riverhead and Hegermiller is denied.

## Conclusion

Plaintiffs' motion for partial summary judgment against Riverhead and Hegermiller is denied. Riverhead's and Hegermiller's motions for summary judgment are also denied, except for the portions of their motions directed at plaintiffs' prima facie tort claims; as to those claims and those claims only, summary judgment is granted.

SO ORDERED.

Dated: Central Islip, New York
June 28, 2011

_____/s_____
Denis R. Hurley
Unites States District Judge
