UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
FIELD DAY, LLC, f/k/a/NEW YORK MUSIC
FESTIVAL, LLC, AEG LIVE LLC f/k/a
AEG CONCERTS LLC,

                Plaintiffs                         **MEMORANDUM & ORDER**
      -against-                            Civil Action No. 04-2202

COUNTY OF SUFFOLK, SUFFOLK COUNTY
DEPARTMENT OF HEALTH SERVICES,
SUFFOLK COUNTY EXECUTIVE ROBERT
GAFFNEY, COMMISSIONER OF THE SUFFOLK
COUNTY DEPARTMENT OF HEALTH
SERVICES BRIAN L. HARPER, COMMISSIONER
OF SUFFOLK COUNTY POLICE DEPARTMENT
JOHN C. GALLAGHER, DIRECTOR OF SUFFOLK
COUNTY DEPARTMENT OF HEALTH SERVICES
ROBERT MAIMONI, CHIEF OF THE BUREAU OF
PUBLIC HEALTH PROTECTION BRUCE
WILLIAMSON, PRINCIPAL PUBLIC HEALTH
SANITARIAN ROBERT GERDTS, DEPUTY
SUFFOLK COUNTY ATTORNEY ROBERT
CABBLE, DEPUTY SUFFOLK COUNTY
EXECUTIVE JOE MICHAELS, SERGEANT
PATRICK MAHER OF THE SUFFOLK COUNTY
POLICE DEPARTMENT, THE TOWN OF
RIVERHEAD, RIVERHEAD CHIEF OF POLICE
DAVID HEGERMILLER and NEW YORK
STATE HEALTH COMMISSIONER ANTONIA
C. NOVELLO.

                Defendants.
----------------------------------------------------------------X


**APPEARANCES:**

**O'Melveny & Myers LLP**
Attorneys for Plaintiffs
7 Times Square
New York, New York 10036
By:    Charles E. Bachman, Esq.
       Mark A. Racanelli, Esq.

**Dennis M. Brown, Suffolk County Attorney**
Attorneys for Suffolk County Defendants
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York 11788
By:     Christopher A. Jeffreys, Esq.

**HURLEY, Senior District Judge:**

Having heard testimony over approximately five weeks, the jury in this case returned a

verdict in favor of the defendants County of Suffolk ("Suffolk" or "County"), Robert Gaffney

("Gaffney"), Robert Gerdts ("Gerdts"), Robert Cabble ("Cabble"), John Gallagher ("Gallagher"),

and Joseph Michaels ("Michaels")  (Gaffney, Gerdts, Cabble, Gallagher, and Michaels are

collectively referred to as the "Individual County Defendants") on the four claims presented by

plaintiffs Field Day, LLC, f/k/a/New York Music Festival, LLC, and AEG Live LLC f/k/a

AEG Concerts LLC (collectively "plaintiffs" or "Field Day"), viz. Claim One: deprivation of

plaintiffs' First Amendment right of free speech under 42 U.S.C. § 1983 against the Individual

County Defendants; Claim Two: Section 1983 *Monell*  claim against the County; Claim Three:

Section 1983 conspiracy claim against the Individual County Defendants; and Claim Four:

deprivation of plaintiffs' right to free speech under Article 1, Section 8 of the New York State

Constitution against the County and the Individual County Defendants.  Presently before the

Court is plaintiffs' post-trial motion seeking judgment as a matter of law or a new trial, pursuant

to Federal Rules of Civil Procedure 50(b) and 59, against Gerdts and the County on Claims One,

Two and Four.  For the reasons set forth below, the motion is denied.

**BACKGROUND**

I.      **Overview**

The background of this action is set forth in the prior decisions of this Court.   Familiarity

with those decisions is presumed.   It suffices to note that this action arises out of Field Day's

efforts to promote and produce a two-day music festival featuring leading rap, hip-hop, and rock

artists which was to take place June 7-8, 2003 (the "Festival").   After considering other locations

and after several months of negotiations, Field Day entered into a "License Agreement for

Outdoor Event" (the "Agreement") with the Riverhead Community Development Agency

("CDA"), a "public instrumentality" of the Town of Riverhead  ("Riverhead") on February 20,

2003 to use a site referred to as "EPCAL."   Under the terms of the Agreement, Field Day had the

responsibility of securing "a 'Mass Gathering Permit' or such other assembly permit as is deemed

necessary by the Commissioner of the Suffolk County Department of Health" prior to the concert

"and a 'Special Event Permit' from the Town of Riverhead . . . ."   The CDA agreed to provide

sufficient police protection and both parties agreed to undertake all necessary coordination with

state, county, and local law enforcement agencies.   Over the next several months, Field Day

worked with Riverhead and Suffolk County in order to obtain the mass gathering permit. On May

27, 2003, Field Day's application for a mass gathering permit was denied via a letter from Gerdts

which reads in pertinent part:

> Chapter 1 State Sanitary Code Subpart 7-1 Temporary Residences
> and Mass Gatherings § 7-1:41 [1] requires that applications for a

---

[1] The citations in this opinion to the Mass Gathering Law and the Sanitary Code are in
accordance with how they existed in 2003.

> permit to operate a mass gathering be accompanied by an
> engineering report. This report must include, in part, "a statement
> from the County sheriff, State police, New York State Department
> of Transportation or other law enforcement agency certifying that
> the traffic control plan is satisfactory."
>
> The Department has received notification from David J.
> Hegermiller, Chief of Police, Town of Riverhead, that his
> Department alone cannot implement an effective traffic control
> plan and therefore, is not able to support the issuance of the permit.
>
> Accordingly, your application for a permit to operate a mass
> gathering is denied.

(Pl. Ex. 44.) Field Day then moved the venue of the concert to Giants' Stadium and scaled it

back to a one day event.

On May 26, 2004, Field Day commenced this action alleging, inter alia, that the Town of

Riverhead and Suffolk County, through their employees, deprived them of their First

Amendment rights by unlawfully failing to approve its mass gathering application, imposing

arbitrary requirements to obtain certification of traffic control plans and intermunicipal

cooperation and refusing to provide police protection and other public assistance requested by

local law enforcement. (DE 44.) After the conclusion of pretrial motions, a settlement with the

Town of Riverhead and its employees, and the discontinuance of claims, the matter was tried

before a jury on the four claims noted earlier, *i.e.,* Claim One: deprivation of plaintiffs' First

Amendment right of free speech under 42 U.S.C. § 1983 against the Individual County

Defendants; Claim Two: Section 1983 *Monell* claim against the County; Claim Three: Section

1983 conspiracy claim against the Individual County Defendants; and Claim Four: deprivation of

plaintiffs' right to free speech under Article 1, Section 8 of the New York State Constitution

against the County and the Individual County Defendants. The jury returned a final verdict in

favor of the County and the Individual County Defendants.

## II.     Legal Standard

### A.     Rule 50

Rule 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.' " *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1741 (2012) (quoting Fed. R. Civ. P. 50(a)(1)); *accord Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 127-28 (2d Cir. 2012).   The "burden is particularly heavy where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Cash*, 654 F.3d at 333 (internal quotation marks omitted); *accord Cross v. N.Y. City Transit Auth.*, 417 F.3d 241, 248 (2d Cir. 2005).   "Under such circumstances, the district court may set aside the verdict only where there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against him." *Id.* (citations, alterations, and internal quotation marks omitted); *accord Stampf v. Long Island R. Co*., 761 F.3d 192, 197-98 (2d Cir. 2014); *see also, e.g., Zellner v. Summerlin*, 494 F.3d 344, 371 (2d Cir. 2007) (stating that a Rule 50 motion may be granted only if the court concludes that "a reasonable juror would have been compelled to accept the view of the moving party" (internal quotation marks omitted)).

In deciding a motion under Rule 50, the Court must disregard any evidence that weighs against the jury's verdict unless the jury was required to believe it.  *Zellner*, 494 F.3d at 370

5

(citing *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 150-51, 120 S. Ct. 2097, 147 L. Ed.2d 105 (2000)). The question is whether, if credibility assessments are made against the moving party and all reasonable inferences are drawn against the moving party, a reasonable jury nevertheless would have no choice but to find in the movant's favor. *Zellner*, 494 F.3d at 370-71 (citing *Piesco v. Koch*, 12 F.3d 332, 343 (2d Cir. 1993)). In other words the court may only grant a Rule 50 motion in this posture if there is " 'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise or conjecture, or . . . [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men [and women] could not arrive at a verdict against him.' " *Cross,* 417 F.3d at 247 (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992)). "Judgment as a matter of law on an issue as to which the movant bears the burden of proof is rare." *Broadnax v. City of New Haven*, 415 F.3d 265, 270 (2d Cir. 2005) (internal quotation omitted).

**B.     Rule 59**

Federal Rule of Civil Procedure 59 provides that a Court may order a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). The standard for granting a new trial under Rule 59(a) is less stringent than the standard for judgment as a matter of law under Rule 50. *See, e.g., Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003). Granting a new trial is appropriate where "the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice." *Nimely v. City of N.Y.*, 414 F.3d 381, 392 (2d Cir. 2005) (internal quotation marks and citations omitted). "Unlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence

himself, and need not view it in the light most favorable to the verdict winner." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir. 1998). But when "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 99 (2d Cir. 2014) (internal quotations omitted); *see also Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 417-19 (2d Cir. 2012) (noting that a district court judge "must exercise their ability to weigh credibility with caution and great restraint," and may not "freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury" (quoting *DLC Mgmt. Corp.*, 163 F.3d at 134, and *United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998)).

## DISCUSSION

### I.     Plaintiffs' Rule 50 Motion

The basis for plaintiffs' Rule 50 Motion may be fairly summarized as follows: The letter denying the mass gathering permit "cited only *one* basis for den[ial] . . .: Field Day's alleged failure to obtain a certified traffic control plan pursuant to Section 7-1.41(d)(2) of the Mass Gathering Law." (Pl. Mem. at 11.) However, section 7-1.41 (d)(2) makes clear and Gerdts admitted that the requirement to obtain a certified traffic control plan applied only to events that planned non-contiguous parking. "The evidence overwhelming showed that Field Day did not have non-contiguous parking." (*Id.*) As the only basis recited by the defendants for the permit denial did not apply, judgment as a matter of law is mandated for Field Day. Further, defendants cannot, "*post hoc* . . . substitute some other basis, other than that cited in the Denial Letter, to

justify the permit denial." (*Id.* at 13.)

A. **The Reasonableness of the Permit Denial**
   **Is Not Limited By the Denial Letter**

The Court turns first to the argument that defendants cannot invoke reasons for the denial

of the mass gathering permit other than the reason provided in its May 27, 2003 denial letter. As

support, plaintiffs cite (1) caselaw for the proposition that in reviewing the propriety of an

administrative agency's determination, a court must confine its focus to the grounds cited by the

agency, and (2) earlier decisions issued in this case. Both these grounds have previously been

rejected by this Court.

Plaintiffs raised this same argument in their memoranda of law for the parties' motion

and cross-motion for summary judgment, relying on the following excerpt from the Second

Circuit's decision affirming the denial of the County Defendants' motion to dismiss:

> To the extent that the Suffolk County Employees now invoke other
> sections of the Sanitary Code to support the denial of the Application,
> New York law limits this Court's review "to the grounds invoked by the
> agency." . . . Furthermore, in accordance with the interpretation of the
> Mass Gathering Law and Sanitary Code given above, the rejection of the
> Application based on any other ground would still have to be reasonable,
> and Field Day has alleged that the rejection was unreasonable.

*Field Day, LLC v. Cnty. of Suffolk,* 463 F.3d 167, 194 (2d Cir. 2004) (citation omitted). (*See* DE

190 at p. 20-21; DE 172 at p. 5; DE 168 at p 6.) In rejecting the argument that the quoted excerpt

precluded the trier of fact from considering other reasonable grounds proffered by the County,

this Court wrote:

> The Second Circuit was simply explaining its appellate role in reviewing
> the motion to dismiss. There is evidence in the record that would permit

the trier of fact to conclude that other reasonable grounds for the County's decision existed.  For example, if the jury found that requiring 200 police officers for the Festival was reasonable and the County's decision not to supply officers in the absence of a[n] intermunicipal agreement appropriate, then the jury could conclude that public safety concerns provided a valid basis to deny the Mass Gathering Permit.

(Mem. & Order, dated June 28, 2011 (DE 216) at 21.)

Prior to trial, in an *in limine* motion, plaintiffs again sought to limit the County and County Defendants in their defense of the permit denial.  In support, plaintiffs relied upon established law that a reviewing court, when evaluating what transpired in an administrative proceeding, is confined to the reasons cited by the administrator.  Acknowledging that caselaw, this Court found it did not limit defendants' defense of the permit denial as none of the causes of action in the complaint seek to  reverse what Suffolk County did in denying the mass gathering permit per se.  "It is significant that we are not talking about an application to reverse or to set aside or modify what the Suffolk County Health Department did in denying the mass gathering permit."  (Tr. at 25.)  "[T]o grant the relief requested by the plaintiffs would be fundamentally unfair in the sense it's completely out of sync with the nature of the dispute as framed by the pleadings and as developed during the course of discovery at great length.  The defendant has a right to defend the charged constitutional violations and . . . cannot be limited to the one ground cited in the denial."  (Tr. at 29.)

Nothing in the instant motion convinces this Court that its summary judgment and *in limine* rulings were erroneous.  Indeed, the Court's charge to the jury, unobjected to by plaintiffs ( *see* Tr. 3752-56), was consistent with these rulings.  The jury was charged that plaintiffs had to prove by a preponderance of the evidence that "one or more of the individual defendants

intentionally or recklessly deprived them of their First Amendment Right to hold the music

festival by *improperly* denying them a mass gathering permit." (Tr. 3968 (emphasis added).) The

jury was further instructed:

> freedom of speech - here, the right to assemble and hold a music festival -
> is not absolute. Which is to say, governmental entities are entitled to
> impose reasonable restrictions if intended to promote such goals as, for
> example, the public health and safety. However, you should consider all
> of the evidence relating to defendants' actions in denying plaintiffs' mass
> gathering permit application, including whether and the extent to which
> their actions were reasonable or unreasonable. In sum, in evaluating
> whether the individual county defendants unlawfully denied plaintiffs'
> First Amendment Rights, you should review all the evidence including the
> evidence relating to the May 27, 2003 denial of the subject mass gathering
> permit and the events leading-up to that denial. It is for you to determine
> whether the defendants' actions were recklessly or intentionally pursued in
> violation of plaintiffs' First Amendment Rights (as plaintiffs contend) or,
> conversely, were undertaken by the County Defendants in a legitimate
> effort to address public safety concerns (as the Individual County
> Defendants maintain).

(Tr. 3970-71.) It is also noteworthy that plaintiffs' own proposed charge on the First

Amendment claim is inconsistent with limiting defendants to what was set forth in the denial

letter.[2]

Thus, plaintiffs are not entitled to judgment as a matter of matter of law merely because

---

[2] That proposed charge reads, in pertinent part:
> In evaluating whether the Individual Suffolk County Defendants
> unlawfully denied Plaintiffs' First Amendment rights, you should consider
> all of the evidence relating to Defendants' actions in denying Plaintiffs'
> mass gathering permit application, including whether and the extent to
> which their actions were arbitrary, politically motivated, unreasonable or
> capricious. You should also consider . . . whether the reasons Defendants
> gave for denying the permit were pretext, whether Defendants properly
> applied the law governing the issuance of mass gathering permits, and
> whether Defendants required that Plaintiffs meet conditions that were not
> required by the mass gathering law."

DE 287 at p.12.

there was to be no contiguous parking and therefore there was no need for a "certified" traffic plan.[3] As detailed below, the jury could have concluded that the reference to a "certified" traffic plan was the result of a mistake and that the denial of the permit was reasonable based on the lack of an effective traffic control plan and/or the lack of police support for the Festival.

**B.     The Reference to a "Certified" Traffic Plan
        May Have Been the Result of a Mistake**

The jury could have concluded that while there was no noncontiguous parking, the reference in the denial letter to the need for a "certified" traffic plan was the result of negligent, not intentional, reckless, or otherwise nefarious, conduct. It is uncontroverted that Gerdts, who was the County's lead permitting agent and placed in charge of reviewing Field Day's permit application, and the other County Health Department employees involved, had no experience with the Mass Gathering law. (Tr. 1726, 1920-22, 2165.) It seems that Gerdts in formulating his check list of the requirements of the Sanitary Code for issuance of a mass gathering permit may have erroneously parsed § 7-1.41(d)(2) into separate and unrelated requirements. This could explain why Gerdts referenced that section knowing all parking was to be contiguous.

Section 7-1.4(d)(2) required an engineering report containing "detailed plans for transportation arrangements from noncontiguous parking . . . ; including a statement from . . . [a] law enforcement agency certifying that the traffic control plan is satisfactory." Gerdts'

---

[3] Defendants did present some evidence, albeit thin, about noncontiguous parking. According to the deposition testimony of Neil Ryan read at trial, there was a parking lot across the road from EPCAL that was going to be used as "staging area" i.e. a parking place for patrons who arrived at the concert early so they would not block the road before the gates opened. (Tr. at 3725-3726; *see also* Tr. at 1778 (testimony of Linda Mermelstein that her understanding was there would be offsite parking.) However, Gerdts did testify that at the time he wrote the denial letter he knew there was no offsite, i.e. noncontiguous, parking. (Tr. 1841).

check list contained two requirements for this subsection: (1) a detailed plan for transportation arrangements from noncontiguous parking and (2) a statement from a law enforcement agency certifying that the "traffic control plan" is satisfactory. *(See, e.g.*, Pl. Tr. Exs. 28 &115 at p. 115.010.) It appears that by Gerdts' omission of the word "including," he untethered the first requirement from the second. Indeed, it would not be unreasonable to require a certified traffic plan where a large number of attendees are expected - in this case up to 60,000 as specified to Field Day's permit application; both County employees and Field Day personnel were under the impression that, at the very least, an "approved" traffic plan was needed. Williamson of the Suffolk County Department of Health included it in his April 17, 2003 letter as one of the requirements for issuance of the permit. (Pl. Tr. Ex. 94.) Christopher Kent, the local attorney hired by Field Day to help with the permitting process, and Andrew Dreskin, the Chief Operating Office of Field Day LLC, both referred to the need to have the Riverhead police sign off on or approve the traffic control plan. ( *Id.*; Tr. 523-25, 622, 1714; Def. Tr. Ex. 50; *see also* Tr. at 1119, 1556-57.) Chief Hegermiller himself believed he had to sign off on the mass gathering permit or it would not be issued. (Tr. 1556-67.)

### C. The Need for a Traffic Plan Sufficient to Ensure the Public Safety

Even though a "certified" traffic plan may not have been required, a traffic plan appropriate for the projected number of concert-goers was needed. According to Field Day's permit application, the Festival was designed for "60,000 attendees," with attendance per day of "between 40,000 and 60,000, of which a moderate percentage is likely to camp at the event." (Pl. Tr. Ex. 7 at p. 7.004; *see also* Pl. Tr. Ex. 68.) Indeed, the parties stipulated that "[w]hether the

event is denominated as a mass gathering or public function, there needs to a be a traffic control plan that provides a way for emergency vehicles to get in and out of the proposed venue and the surrounding area." (Tr. 3944; *see also* 10 N.Y.C.R.R. § 7-1.43(a) (requiring the site "to be serviced by access roads which will permit an adequate flow of traffic and ensure the free passage of emergency vehicles.").)  Here, there was substantial evidence from which the jury could conclude that plaintiffs' traffic plan was inadequate and the potential for monumental traffic issues precluding the passage of emergency vehicles justified the denial of the mass gathering permit.[4]

David Candelaria of the New York State Police drove the roads surrounding the EPCAL site and did a total site overview in a helicopter.  Both times he determined that the roads could not safely handle the event.  Route 25, the main access road to the site, is one lane in either direction and for portions of the road there is no usable shoulder. (Tr. 2874; 2855; 2838-39.)

Suffolk County Police Commissioner Gallagher also drove the two main routes (Route 25 and Wading River Road) that Field Day proposed to have attendees access the EPCAL site. Having received  much information from others, he felt he should go out and investigate the route himself.  While both roads are one lane in either direction, Route 25 was the road of most concern as there were portions without a shoulder.  Because of the absence of a shoulder for a good portion of the road, there was no way to get any type of emergency vehicle past traffic if it was stalled.  Taking into account that it is very unlikely to have an empty road on eastern long island on a summer afternoon or evening, use of the oncoming traffic lane, as suggested by Field

---

[4] Although inartfully phrased to say the least, the denial letter did reference the inability to implement an effective traffic control plan.

Day's traffic consultant (Tr. 1045-56) was not feasible. (Tr. 472-73, 2389; 2399-2405; 2451-56.) Even in the absence of non-concert traffic, use of the oncoming traffic lane was extremely problematic during the time that Saturday's attendees would be exiting and Sunday's attendees arriving. As plaintiff's traffic engineer acknowledged, during the time that both Saturday's attendees would be trying to leave and Sunday's attendees would be arriving, there will be "major logistical problems . . . this confusion of entering and leaving at the same time will increase the probability that the transportation system will fail." (Def. Tr. Ex. 168.) According to Commissioner Gallagher, he could not reasonably assure that emergency vehicles could get to people located along Route 25 if the Festival were held. (Tr. 2383, 2455.)

Plaintiffs' own event planner also expressed concern for traffic backups approaching the concert venue: "Remember . . . we are out on Eastern LI and I don't have any special or secret routing up my sleeve. . . . If they gridlock, you'll have a bigger problem on your hands than worrying about a good experience for the kids!" (Def. Tr. Ex. 65.) Also, the New York State Department of Transportation by letter dated June 2, 2003 wrote to Field Day concerning deficiencies in its traffic plan, including, among other things, failing to "provide an adequate buffer to clear the expected traffic queues." (Def. Tr. Ex. 287.) And although Robert Delagi of Suffolk's Department of Health testified that he had no problem with Field Day's traffic plan including ingress and egress for emergency vehicles, he also testified that he did not have information regarding expected traffic patterns; he relied on the police department for that information. (Tr. 2175-76.)

Examining Field Day's proposed traffic plan (Pl. Tr. Ex. 4; *see also* Pl. Tr. Exs. 161, 163, 164) in light of the above and other testimony and evidence (*see, e.g.,* Tr. 392-96, 450-54,

475-76, 709, 1556, 3117-18, 3331-42; 3535, 3729; Def. Tr. Ex. 15), the jury could appropriately conclude that denial of the mass gathering permit was reasonable because Field Day's traffic plan was inadequate to ensure the public's safety.

In addition to traffic issues, as detailed by the evidence discussed below, the jury may have determined that the lack of adequate police and the attendant effect on public safety was a reasonable basis for denial of the permit.

### D. The Lack of Adequate Police for the Festival

The testimony of Linda Mermelstein, Acting Commissioner for the Suffolk County Department of Health Services during the relevant period, is instructive. As Commissioner, the final decision as to approval or denial of Field Day's mass gathering permit application rested with her. (Tr. 1767-68.) According to Mermelstein, in addition to the provision of the Sanitary Code cited in the May 27 denial letter, Field Day has failed to get the support of the police: "[W]e had letters from the police departments saying that they could not support the event, it basically wouldn't be safe. So it was also for the health and safety of the people who participated." According to Mermelstein, her department received letters from the Riverhead Police Department, the New York State Troopers and the Suffolk County Police Department that they could not support the event. (Tr. 1799-1800.) "I concluded that based on the fact that I had letters from three different officials: state, town and county, all stating that they cannot support the event, they wouldn't approve the traffic control plan, that it would not be safe without the police." (Tr. 1804; *see also* Tr. 129-30 (Dreskin testimony that the consensus was that uniformed police should be inside the event), Tr. 1948-50 (testimony of Robert Gerdts that the police involvement needed to take place for the event to happen), Tr. 3143 (testimony of Robert

15

Maimoni that his understanding was the permit was denied because there was not sufficient police) Tr. 3588-91 (testimony of County Executive that permit was denied in the interest of public safety).)   According to the Agreement, Riverhead was responsible to provide sufficient police protection for the Festival.  Yet the ability of the Riverhead Police Department to supply a sufficient number of officers to ensure the public's safety was a concern from the start.

       1.  <u>Chief Hegermiller's Initial Concerns</u>

Upon learning of the Agreement, Riverhead Police Chief David Hegermiller wrote to the Riverhead Town Supervisor on April 10, 2003, regarding the security, communications and transportation concerns he had with Riverhead hosting the Festival. After noting that the materials received from Field Day dated April 7, 2003 had "no substance," Chief Hegermiller went on to express that the time needed to plan a successful event would be at least ten to 12 months but there was less than two months to plan for the Festival and that additional police manpower and equipment would be needed raising budgetary concerns. Traffic was another issue which disturbed Chief Hegermiller given his experience with the traffic nightmare caused by a much smaller event, as well as the fact that some of the traffic problem involved other townships who might be unhappy with the lack of sufficient time to plan.   Lastly, Chief Hegermiller addressed evacuation and terrorism and the inability to evacuate the site quickly.  (Pl. Tr. Ex. 96.)

Despite these reservations, Chief Hegermiller proceeded to solicit assistance from other law enforcement agencies, principally the New York State Police and the Suffolk County Police. Assistance was sought both with traffic and the policing of the grounds of the Festival.

       2.  <u>New York State Police</u>

One of the agencies contacted by Hegermiller was the New York State Police.  (Def. Tr.

Ex. 349)  David Candelaria, the emergency management NCO for Long Island attended a

meeting on behalf of the New York State Police in early April regarding the Festival.  During the

meeting he advised Chief Hegermiller that there was not enough time to plan for an event of this

size; September 11 changed how the police planned for any large scale event and it now required

long-term planning of the event.  According to Candelaria, one of the planning elements

necessary was a police traffic plan - which is totally separate from the promoter's traffic plan.

The general consensus at the meeting was that over 200 troopers would be needed - not only

uniformed officers but "a bomb disposal unit, canine, tactical element, aviation and intelligence

investigators" - "a whole gamut of specialized services."  (Tr. 2824-28; 2878-80.)  On April 16,

2003, Candelaria advised Chief Hegermiller that because of the lack of time to prepare and other

matters the State Police were involved in, including the need to put uniformed officers on both

the Long Island Railroad and MetroNorth Railroad because the terrorist alert was orange, they

would not be providing Riverhead with a large-scale detail. (Tr. 2845- 2847.)

### 3. Suffolk County Police Department

Chief Hegermiller also contacted the Suffolk County Police Department.   Before

discussing testimony in that regard, the organization of  police services in Suffolk needs to be

explained.  The Suffolk County Police Department provides patrol services only to the five

western towns of Suffolk County, the five eastern towns - including Riverhead - having opted to

maintain their own police departments.  The five western towns are organized into the Suffolk

County Police District and only residents of the five western towns are taxed for patrol services.

The Suffolk police department does  provide specialized services, such as homicide investigators,

to all the ten towns in the County and the residents of all ten towns contribute taxes for these

costs. According to the testimony, officers in the patrol division would be used to staff an event such as Field Day. (Tr. 2909, 3287-90, 3296-7.)

Returning to Hegermiller's request for assistance, the Riverhead Police Chief wrote to Suffolk County Police Commissioner Gallagher on April 11, 2004, asking for assistance with Field Day's music festival, estimating a need for 200 police personnel, with Riverhead supplying about 50. (Pl. Tr. Ex. 110) Assistance was also requested for two events, a Bonnaroo Concert and the New York Air Show. Gallagher responded on April 22, 2003, writing that with respect to Field Day: "Expenditures of basic salary costs alone . . . would be prohibitive for this Department without reimbursement. . . . It is not possible for this Department to absorb a cost of that magnitude. I would have to be assured of reimbursement from the Town of Riverhead or some other source for these basic expenses." (Pl. Tr. Ex. 112; *see also* Tr. 1539 (Gallagher verbally advised Hegermiller on April 16 that the Suffolk police were not going to participate).)

By memorandum dated April 16, 2003, Chief Hegermiller advised the Riverhead Town Supervisor that the New York State Troopers were unable to commit any personnel to assist with Field Day. He further advised that the Suffolk County Police "advised that they would also not commit any personnel to the event besides the traffic detail that would cover the problems within the Suffolk County Police District." He concluded by writing: "This memo is to inform you that there is no way for us to handle this event without additional manpower. Hence, I would not be able to give approval to the County's mass gathering permit and subsequently the County would not issue the mass gathering permits." (Def. Tr. Ex. 350; Tr. 1549.) The Riverhead Town Supervisor understood from Gallagher's letter and Hegermiller's memo that other than the referenced traffic detail, the Suffolk police would not be participating in the Field Day event.

(Tr. 1368-69.)

Nonetheless, one or more representatives of the Suffolk police department continued to attend meetings regarding the festival for informational purposes. (Tr. 2076, 2144.) While plaintiffs made much of the fact that none of the representatives of the Suffolk police department who attended these meeting ever said that the Suffolk police would not be participating, the jury could have concluded that was not surprising in view of Commissioner Gallagher's April letter to Chief Hegermiller. Additionally, Detective-Sergeant Maher, who attended many of the Festival meetings on behalf of the Suffolk police, testified he had no authority to commit to the use of Suffolk police. (Tr. 2095-2126, 2142.)

It would appear, however, that Suffolk was still open to the possibility of providing assistance to Chief Hegermiller. At a meeting held on May 8, the Suffolk County Attorney's office was asked to investigate (1) whether the County police department could be reimbursed for its costs to assist in the Festival; (2) would the department be able to obtain jurisdiction to operate in Riverhead; and (3) how could the County be indemnified against any claims arising from its participation in the event. (Tr. 2216-19.) The Suffolk County Attorney's office determined that in order to provide assistance to this event an intermunicipal agreement was necessary and so advised both Field Day and Riverhead, first verbally on May 9 and then in writing to Riverhead on May 15, 2003. (Def. Tr. Ex. 61; Pl. Tr. Ex. 93; Tr. 1374-75, 1722-27, 2232-33; *see also* Tr. 3296-97 (testimony of Joseph Monteith, plaintiffs' liaison, that he discussed with Field Day personnel in early May that because the Festival was within the jurisdiction of Riverhead police, some kind of arrangement would have to be made by the Town of Riverhead with the County as to jurisdiction and whether there would be a reimbursement).)

The agreement would cover both reimbursement and indemnification of the County, as well as authorize the Suffolk police to act within Riverhead's jurisdiction. No assurances were made by the County that the intermunicipal agreement could be effectuated in time for the Festival. (Tr. 1727.)

On May 19, Riverhead requested that the Suffolk County Attorney provide it with a draft of the proposed agreement. (Pl. Tr. Ex. 91; Tr. 1382-84.) Assistant Suffolk County Attorney Robert Cabble replied the next day. After noting that Riverhead had not addressed the issues regarding cost allocation, defense, indemnification and police jurisdiction, he advised that any agreement would need to be approved by the Suffolk County legislature and there was no regularly scheduled meeting of the Legislature before the date of the event. (Pl. Tr. Ex. 91.) Given the Police Commissioner's concerns about the lack of time to prepare and the potential for traffic precluding adequate access for emergency vehicles and the resultant threat to the public safety of both residents and concert attendees, on May 22 the Suffolk County Executive decided he would not call a special session of the legislature. (Tr. 2254-55, 2317, 3514, 3589-95.)

Commissioner Gallagher advised Chief Hegermiller, by letter dated May 23, that the Suffolk County Police would not be assisting Riverhead with policing the Festival. (Pl. Tr. Ex. 39.) That same day, Chief Hegermiller wrote to Robert Gerdts and advised that given Suffolk County would not be providing police assistance, he was "unable to support issuance of the Mass Gathering Permit. If at some time in the immediate future, the Suffolk County Police Department or some other police agency is able to assist . . . I then may be able to support the issuance of the Permit." (Pl. Tr. Ex. 42.)

### a. Timing of Suffolk County Police Department's Decision

While plaintiffs characterize Suffolk's decision not to provide police as having been made at the last minute, there is evidence from which the jury could conclude that plaintiffs were aware of possible problems on that front for several weeks prior to the issuance of the denial letter. For example, there is Commissioner Gallagher's April 22 letter to Chief Hegermiller (Pl. Tr. Ex. 112) and Andrew Dreskin's testimony regarding a lobbyist for Field Day contacting the then New York governor in April on the subject of using the state police for the event (Tr. 603), as well as reaching out to people with strong ties to Suffolk for assistance (Tr. 607). Dreskin also admitted that in early May he knew that "police was an issue." (Tr. 633.) In addition to Commissioner Gallagher's April 22 letter, the issue of cost was raised by the County Executive's office with Field Day's public relations representative Gary Lewi on April 23. (Def. Tr. Ex. 45; *see also* Def. Tr. Ex. 52.) Also, various traffic plans prepared by Creighton & Manning for Field Day did not list the Suffolk County Police Department as one of the cooperating law enforcement agencies. (Pl. Tr. Exs. 13, 43; Def. Tr. Exs. 161, 164; Tr. 1107, 1138, 1158, 1165.) Indeed, it was not until after the May 9 meeting in which the need for an intermunicipal agreement was discussed by the County with Field Day that the traffic plans were changed to add the Suffolk County Police. (Tr. 1211-14.) Finally, no assurances were made that the County would provide support. (Tr. 2095-2126, 2142.)

### b. The Need for an Intermunicipal Agreement

Plaintiffs point to the fact that Suffolk County had never before refused to provide police assistance for an event and had never before required an intermunicipal agreement to do so as evidence that the county's actions were unreasonable. Sufficient evidence exists, however, to

conclude that both actions were reasonable.  First, with respect to events such as the U.S. Open, planning for the event started more than a year in advance providing police with sufficient time to make plans to ensure the safety of the public.  Here, the County police had only about two months to plan this large event in a post 9/11 world.  (Tr. 1500-01, 1516-18; Pl. Tr. Exs.  39, 97.) Additionally, the jury could have concluded that just because the County had failed in the past to secure an intermunicipal agreement should not preclude it from securing such an agreement for Field Day.  (*Cf.* Tr. 2230 (testimony of Assistant County Attorney Cabble that he did not know that Suffolk had provided police to other events outside its jurisdiction without an intermunicipal agreement).)  After all, it was Riverhead who was receiving a large fee for the lease of EPCAL and who had agreed to provide sufficient police protection, yet its residents did not underwrite the costs of Suffolk County Police Department's patrol services, i.e., the police district - the services Riverhead sought to utilize.  It was Riverhead who entered into an agreement to provide sufficient police protection for the Festival without knowing whether there were sufficient Riverhead police to ensure a safe event and without consulting other law enforcement agencies as to whether they were able to assist by providing police officers.  (Tr. 1352-53; *see also* Tr. 1481-83.)  And when the Suffolk Police Commissioner advised Riverhead in April that it could not absorb the cost of assistance and would need assurances of reimbursement to participate, Riverhead did not respond with such an assurance.[5]  The jury could have concluded that the intermunicipal agreement's provision for reimbursement and indemnification of the County was good stewardship, i.e., reasonable protection for the pocketbook's of its residents. (Tr. 2216-17,

---

[5]Indeed, while Riverhead had previously entered into intermunicipal agreements  with the County (Tr. 1228, 1263), there is no evidence it proposed such a solution in response to Gallagher's April letter.

3556-59; *see* Tr. 2443 (Suffolk police budget had no line item for the Festival); Tr. Ex. 115 & Tr. 2105 (estimating cost to Suffolk of policing the Festival at over $500,000); Tr. 3116 (intermunicipal agreements used when there is an impact on finances of the County.)[6]

### 4. Riverhead Could Not Supply Sufficient Police for the Festival

Finally, the issue of the number of police needed to adequately police the Festival will be briefly addressed. As noted earlier, the three police departments that looked at the Festival plans determined that at a minimum 150 police officers were needed. *See* pp. 14-15 *supra.* While plaintiffs proffered testimony that the number of officers was much less (*see, e.g.,* Tr. 475-76, 617), the jury was not bound to accept that testimony. Of particular note is that Chief Hegermiller was consistent in his professional opinion that without assistance from other law enforcement, Riverhead could not adequately police the Festival and ensure the safety of all. (Pl. Tr. Exs. 42, 96; Def. Tr. Ex. 350; Tr. 1549, 2214-16; *see also* 1988-89.)

The foregoing is but a portion of the evidence that supports the jury's verdict. There is neither a "complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," nor "an overwhelming amount of evidence in favor of [plaintiffs] that reasonable and fair minded [persons] could not arrive at a verdict against [them]." Accordingly, the motion pursuant to Fed. R. Civ. P. 50 is denied.

---

[6] Plaintiffs maintained that an intermunicipal agreement was not necessary as the Suffolk police could have provided support to Riverhead as "mutual aid." Given the testimony that the provision of support to another municipality under the concept of mutual aid is reserved for emergencies (Tr. 1239-40, 1261, 2310-11), the suggestion that Suffolk should have provided police officers for the Festival as mutual aid was not one the jury had to accept.

**II.      Plaintiffs' Rule 59 Motion**

The standards applicable to a Rule 59 application for a new trial are set forth *supra*. A juxtapositioning of those standards or considerations against the facts at hand counsels against granting the alternate relief sought, primarily for the reasons articulated with respect to plaintiffs' Rule 50 motion. The case was well presented by both sides to a conscientious jury which rendered a verdict consistent with the evidence. The Court is confident that there was neither a miscarriage of justice nor a seriously erroneous result; a new trial is not warranted.

## CONCLUSION

For the reasons provided above, plaintiffs' motion for judgment as a matter of law or, alternatively, for a new trial is denied.

Dated: Central Islip, New York
         March 18, 2015                                    /s/  Denis R. Hurley
                                                           Denis R. Hurley
                                                           United States District Judge